ZUBER ET AL. *v.* ALLEN ET AL.

No. 25.   Argued October 16, 1969—
Decided December 9, 1969*

---

*Together with No. 52, *Hardin, Secretary of Agriculture* v. *Allen et al.*, also on certiorari to the same court.

*Lawrence D. Hollman* argued the cause for petitioners in No. 25. With him on the briefs was *Carlyle C. Ring, Jr.* *Daniel M. Friedman* argued the cause for petitioner in No. 52. On the briefs were *Solicitor General Griswold, Assistant Attorney General Ruckelshaus, Peter L. Strauss, Alan S. Rosenthal,* and *Walter H. Fleischer.*

*Charles Patrick Ryan* argued the cause for respondents in both cases. With him on the brief was *Edward J. Ryan.*

*Edwin H. Amidon, Jr.,* Assistant Attorney General, argued the cause for the State of Vermont as *amicus curiae* urging affirmance in both cases. With him on the brief was *James M. Jeffords,* Attorney General.

*Robert H. Quinn,* Attorney General of Massachusetts, *pro se, Walter H. Mayo III,* Assistant Attorney General, *Herbert F. DeSimone,* Attorney General of Rhode Island, *pro se, Charles G. Edwards,* Assistant Attorney General, *Robert K. Killian,* Attorney General of Connecticut, *pro se,* and *Michael J. Scanlon,* Assistant Attorney General, filed a brief for the Attorneys General of Massachusetts, Rhode Island, and Connecticut as *amici curiae* urging reversal in both cases.

*C. Wayne Smyth* filed a brief for Lorton Blair et al. as *amici curiae* urging affirmance in both cases.

MR. JUSTICE HARLAN delivered the opinion of the Court.

This action was brought by respondent Vermont dairy farmers, "country" milk producers, seeking a judgment invalidating as contrary to the Agricultural Marketing Agreement Act of 1937, as amended, 50 Stat. 246, 7 U. S. C. § 601 *et seq.* (1964 ed. and Supp. IV), the so-called farm location differential provided for by order

of the Secretary of Agriculture.[1] The effect of that order is to require milk distributors to pay to milk producers situated at certain distances from milk marketing areas, "nearby" farmers, higher prices than are paid to producers located at greater distances from such areas. The District Court issued a preliminary injunction on January 16, 1967, against further payments and on respondents' motion for summary judgment transformed its decree into a permanent injunction on June 15, 1967. The Court of Appeals for the District of Columbia Circuit affirmed. 131 U. S. App. D. C. 109, 402 F. 2d 660 (1968). We granted certiorari to resolve the important issue of statutory construction involved in this aspect of the administration of the federal milk regulation program. 394 U. S. 958 (1969).

---

[1] The Secretary has promulgated comprehensive regulations to govern the marketing of milk, 7 CFR § 1002.1 *et seq.* (1969), pursuant to the Agricultural Marketing Agreement Act. The provisions relevant to this cause are set forth in Part I of this opinion, at 178, *infra.*

The action was originally brought against the Secretary only. Petitioners Zuber et al., nearby farmers, unsuccessfully sought leave to intervene before the District Court in support of the Secretary's regulations. When judgment was rendered against the Secretary, petitioners sought leave to intervene for the purposes of appeal. Leave was granted and the Secretary also decided to take an appeal. The parties have devoted a good deal of energy to disputing what constitutes the record in this litigation. Petitioners at various times have referred us to the testimony and record compiled in an action brought in the Northern District of New York, *Cranston* v. *Freeman,* 290 F. Supp. 785 (1968). Respondents have objected, noting that the record in *Cranston* is not formally before this Court, and have included in the appendix various materials that were not of record below. The Court need not pause over the controversy since none of the materials in respondents' appendix is decisive of the action before us. As for the references to the *Cranston* record, they too are not decisive of the dispute.

# I

## BACKGROUND

Once again this Court must traverse the labyrinth of the federal milk marketing regulation provisions.[2] While previous decisions have outlined the operation of the statute and the pertinent regulations, a brief odyssey through the economic and regulatory background is essential perspective for focusing the issue now before the Court.

### A. The Economics of the Milk Industry

The two distinctive and essential phenomena of the milk industry are a basic two-price structure that permits a higher return for the same product, depending on its ultimate use, and the cyclical characteristic of production.

Milk has essentially two end uses: as a fluid staple of daily consumer diet, and as an ingredient in manufactured dairy products such as butter and cheese. Milk used in the consumer market has traditionally commanded a premium price, even though it is of no higher quality than milk used for manufacture. While cost differences account for part of the discrepancy in price, they do not explain the entire gap. At the same time the milk industry is characterized by periods of seasonal overproduction. The winter months are low in yield and

---

[2] See, *e. g., Lehigh Valley Cooperative* v. *United States*, 370 U. S. 76 (1962); *Brannan* v. *Stark*, 342 U. S. 451 (1952); *Stark* v. *Wickard*, 321 U. S. 288 (1944); *United States* v. *Rock Royal Co-op.*, 307 U. S. 533 (1939); *H. P. Hood & Sons* v. *United States*, 307 U. S. 588 (1939). The lower courts have also been plagued by the milk problem. See especially Judge Frank's lament, *Queensboro Farm Prods.* v. *Wickard*, 137 F. 2d 969 (C. A. 2d Cir. 1943); see also *Blair* v. *Freeman*, 125 U. S. App. D. C. 207, 370 F. 2d 229 (1966); *Green Valley Creamery* v. *United States*, 108 F. 2d 342 (C. A. 1st Cir. 1939).

conversely the summer months are fertile. In order to meet fluid demand which is relatively constant, sufficiently large herds must be maintained to supply winter needs. The result is oversupply in the more fruitful months. The historical tendency prior to regulation was for milk distributors, "handlers," to take advantage of this surplus to obtain bargains during glut periods. Milk can be obtained from distant sources and handlers can afford to absorb transportation costs and still pay more to outlying farmers whose traditional outlet is the manufacturing market.[3] To maintain income farmers increase production and the disequilibrium snowballs.

To protect against market vicissitudes, farmers in the early 1920's formed cooperatives. These cooperatives were effective in eliminating the self-defeating overproduction by pooling the milk supply and refusing to deal with handlers except on a collective basis.[4] During

----

[3] For fluid use, milk must be transported in its natural state and as such is a bulky and highly perishable commodity. Thus cost of shipment to a consumer market is greater than transporting an equal supply to a manufacturing plant. These factors, combined with more rigid sanitary requirements for plants distributing the fluid product, see Agricultural Adjustment Administration Report, May 1933–Feb. 1934, p. 154, explain part of the disparity between the price for Class I (fluid milk) and Class II (other uses) milk. Nearby producers, given equilibrium of supply and demand, are logical fluid suppliers to the urban areas. See generally J. Cassels, A Study of Fluid Milk Prices (1937).

[4] The cooperative system amounted to a pooling arrangement wherein participating producers would bargain collectively with the handlers and threaten to withhold their milk if the handlers refused to agree to purchase a certain minimum percentage of their Class I fluid milk from the pool. Without this supply the handlers would be unable to meet their winter requirements.

Essential to this arrangement of course was a sufficiently wide membership to insure no alternative source of supply to recalcitrant handlers.

The second aspect of the arrangement was the division of the profits among the producer members of the cooperative. Frequently

the 1920's era of relative market stability the nearby farmers enjoyed premium prices for their product. These favorable prices were apparently attributable to reduced transportation costs and also the nearby farmer's historic position as a fluid supplier.[5]

## B. The First Federal Program

The drop in commodity prices during the depression years destroyed the equilibrium of the 1920's and utter chaos ensued. Congress, in an effort to restore order to the market and boost the purchasing power of farmers, enacted the licensing provisions of the Agricultural Adjustment Act, 48 Stat. 31, 35. Under § 8 (3) the Secretary of Agriculture was empowered

"[t]o issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of

employed was a base-rating plan whereby each producer would be assigned a percentage of his milk for which he could claim payment at the Class I fluid price. For the remaining production he would be paid at the Class II rate. Apparently bases were assigned according to the anticipated participation of the producer in the fluid market. As a result, nearby producers received more favorable bases in view of their historical role as fluid suppliers in an equilibrium market. For descriptions of the cooperative systems see Cassels, *supra*, n. 3, at 56–70; J. Black, The Dairy Industry and the AAA 49–51 (1935).

[5] Because they were historically fluid suppliers the nearby producers apparently maintained at all times production sufficient to service the consumer fluid market. In addition their close proximity enabled them to deliver to small retailers. As such they were potential competitors.

Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal economic conditions in the marketing of such commodities or products and the financing thereof. The Secretary of Agriculture may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. . . ."

Under the licensing system base-rating plans not unlike the private arrangements that obtained in the 1920's were adopted.[6] Producers were assigned bases which fixed the percent of their output that they would be permitted to sell at the Class I price that was paid for fluid milk.[7] The viability of the licensing scheme was jeopardized, however, by judicial decisions disapproving a similarly broad delegation of power under the National Industrial Recovery Act provisions, 48 Stat. 195. *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495 (1935). With its agricultural marketing program resting on quicksand, Congress moved swiftly to eliminate the defect of overbroad delegation and to shore up the void in the agricultural marketing provisions. Section 8 (3) of the 1933 Act was amended in 1935 and the pertinent language has been carried forward without significant

---

[6] See Agricultural Adjustment Administration Report, *supra,* n. 3, at 159–161; G. Barnhart, The Development of the Licenses and Order Regulating the Handling of Milk in the Greater Boston, Massachusetts, Marketing Area, Nov. 3, 1933–June 1, 1946 (unpublished dissertation on file with Department of Agriculture and Harvard University).

[7] License 38 for the Boston area provided more favorable bases for the nearby producers. See Barnhart, *supra,* n. 6, at 95–96.

change into § 8c of the present Act. Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, as amended, 7 U. S. C. § 608c (1964 ed. and Supp. IV).[8]

---

[8] "(5) Milk and its products; terms and conditions of orders.

"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7) of this section) no others:

"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such use classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers:

"(B) Providing:

"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them: *Provided*, That except in the case of orders covering milk products only, such provision is approved or favored by at least three-fourths of the producers who, during a representative period determined by the Secretary of Agriculture, have been engaged in the production for market of milk covered in such order or by producers who, during such representative period, have produced at least three-fourths of the volume of such milk produced for market during such period; the approval required hereunder shall be separate and apart from any other approval or disapproval provided for by this section; or

"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered;

"subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the

## C. The Present Regulatory Scheme

The present system, which differs little in substance from the scheme conceived in 1937 for regulating the Boston market,[9] provides for a uniform market price payable to all producers by all handlers.[10]   Prices are established for Class I and Class II uses.   The total volume of milk channeled into the market in each category is multiplied by the appropriate coefficient price and the two results are totaled and then divided by the total number of pounds sold.   The result represents the average value of milk sold in the marketing area and is the basic "uniform" price.   Were all producers to receive this price they would share on an equal basis

milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk, which may be adjusted to reflect sales of such milk by any handler or by all handlers in any use classification or classifications, during a representative period of time which need not be limited to one year."

[9] The Boston order of 1937, 2 Fed. Reg. 1331, established uniform prices for all producers at $3.19 and $3.01 per cwt. of milk, depending on the place of delivery, with a further adjustment for transportation to the handler's plant in the marketing area.   Article VIII, § 4 (1) also provided for an adjustment based on the cost of transporting milk from outlying plants to the primary Boston market.   The present regulations calculate price with reference to the purchasing power of milk based on the 1958 cost-of-living index.   No transportation adjustment is provided for in calculation of the uniform price under § 1001.62 of the order.   Differentials to compensate for zone of delivery are retained as separate adjustments.   See *infra*.

[10] The Secretary has three alternative modes of proceeding under the Act.   He may establish "use" prices which all handlers must pay to all producers according to the actual amount of milk used in each category, § 8c (5) (A); individual handler pools where all producers or cooperatives selling to an individual handler shall be paid a uniform price for milk delivered to that handler; or a marketwide pool where all handlers must pay all producers a uniform price for all milk delivered irrespective of end use.

the profits of Class I marketing and assume equally the costs of disposing of the economic surplus in the Class II market. The actual price to the producer is, however, the "blended" price which is computed by adding and subtracting certain special differentials provided for by statute and order. See 7 CFR § 1001.64 (1969). The deduction for differential payments withheld for the benefit of nearby producers reduces the uniform "blended" price to those producers ineligible to collect this particular adjustment.[11] The provision is contained in § 1001.72 of the order and provides:

> "*In making the payments to producers . . . each handler shall add any applicable farm location differential specified in this section.*

> "(a) With respect to milk received from a producer whose farm is located within any of the places specified in this paragraph, the differential shall be 46 cents per hundredweight, unless the addition of 46 cents gives a result greater than the Class I price determined under §§ 1001.60, 1001.62, and 1001.63 which is effective at the plant at which the milk is received. In that event there shall be added a rate which will produce that price."

A differential of 23¢ is provided for deliveries from farms in intermediate nearby zones. § 1001.72 (b).

The foregoing provisions appear in the so-called 1964 Massachusetts-Rhode Island Order, which consolidated into one region the four sub-markets which were pre-

---

[11] Also included is an adjustment for delivery to a nearby plant. The location of handler plants is classified by zones. 7 CFR § 1001.62. Delivery to a plant located nearby the consumer market is, of course, advantageous to the handler and the producer is compensated for this service. The handler also saves the cost of handling and processing at his country plant in addition to saving transportation cost. Conversely, depositing milk at handlers' plants in outlying districts results in a negative adjustment.

viously regulated separately under the so-called four "New England" orders: the 1951 Boston order which carried forward the order adopted for the Boston area in 1937; the Springfield order promulgated in 1949; and the Southeastern New England order of 1958. Each order included a provision for a nearby differential payment to farmers within a stated radius of a designated market center. For example the differential under the Boston order was payable to farmers located within a 40-mile radius of the State House in Boston; a slightly lower differential was paid to farmers within an 80-mile radius. Under the 1964 order there is no central point for the computation of the radius for payment of the differential; the Secretary has retained the differential provisions as they appeared in the previous four orders. Farmers who would have been entitled to the differential under any one of the previous four marketing regulations continue to receive those payments under the present order. These nearby farmers are eligible for the differential on any shipments within the New England marketing area, even though their milk may actually be used outside the radius of their particular nearby zone.

## II

## THE STATUTORY SCHEME

The foundation of the statutory scheme is to provide uniform prices to all producers in the marketing area, subject only to specifically enumerated adjustments. The question before the Court, stated most simply, is whether payment of farm location differentials, set forth above, is a permissible adjustment under § 8c (5)(B) to the general requirement of uniformity of price.[12]

---

[12] Section 8c (5) (B) (ii) requires all uniform prices to be paid "irrespective of the uses made of such milk by the individual handler to whom it is delivered." Respondents contend that the nearby differ-

The Secretary has in the past labeled the "nearby" differential a "location" differential and defended its inclusion in his orders on that ground. The justification and argument are now, however, pitched in a different key. The Government has apparently abandoned all but one of the numerous theories advanced below, and pressed most vigorously in the *Blair* v. *Freeman* litigation (125 U. S. App. D. C. 207, 370 F. 2d 229 (1966)), and it now stresses the provision in § 8c (5)(B) for "volume, market, and production differentials customarily applied by the handlers subject to such order."

While the proper resolution of the issue is by no means self-evident, we are persuaded that "market . . . differentials customarily applied" contemplates *cost* adjustments. The plain thrust of the federal statute was to remove ruinous and self-defeating competition among

---

ential is merely a disguised payment for the nearby suppliers' greater share of fluid milk sales. Such was apparently the case in the New Jersey order invalidated by the Court of Appeals in *Blair* v. *Freeman, supra*, where the payment of the differential was explicitly linked to the percentage of nearby milk actually supplied to the fluid market. We share respondents' skepticism and our doubts are reinforced by the explicit connection of differential payments with the share of fluid milk supplied in the 1936 Boston order. Further cause for skepticism is found in the present zone differential structure which undercompensates the handlers for transportation from outlying districts and thus encourages them to buy from nearby farmers. See Kessel, Economic Effects of Federal Regulation of Milk Markets, 10 J. Law & Econ. 51, 64–65 (1967). Here, however, unlike the situation in *Blair* v. *Freeman, supra,* the producer receives the differential irrespective of the use to which his milk is ultimately put. Since the nearby differential in the present order is not directly tied to the percentage of fluid milk sales, although the order limits differential payments to 46¢ or the Class I price, whichever is higher, we accept the Government's contention that, as a matter of strict logic, the payment of differentials based on the historical position of nearby producers as fluid suppliers, is not inconsistent with the irrespective-of-end-use requirement.

the producers and permit all farmers to share the benefits of fluid milk profits according to the value of goods produced and services rendered. The Government's proposed reading of the Act, bottomed, as it is, on the historical payment of a premium to nearby farmers during the monopolistic era of the cooperative pools, would come to perpetuate economic distortion and freeze the milk industry into the competitive structure that prevailed during the 1920's.

Without the benefit of government muscle to eliminate crippling price warfare in the summer months, neither nearby nor country producers could share in the monopoly-type profits that accrue from fluid milk sales. Absent regulation only the handlers, if anyone, would stand to benefit from the "fluid" monopoly. While we cannot project what would be the case today if a free market prevailed, we might well anticipate that the nearby producers' winter advantages would be negligible in view of reduced transportation costs and more reliable refrigeration. Thus even in winter handlers might be free to play nearby and outlying farmers against each other since handlers would be free of the leverage exercised by the nearby cooperatives during the 1920's. Nearby producers now seek the best of both worlds. Having achieved the security that comes with regulation, they seek under a regulatory umbrella to appropriate monopoly profits that were never secure in the unregulated market.

We are reluctant to attribute such intent to Congress and, simply in the name of administrative expertise, to follow a path not marked by the language of the statute. Indeed, such signposts as may be discerned from the legislative history point in a very different direction. The legislative history strongly suggests that "market differentials," as well as all the other differentials, contemplated particular understood economic adjustments. The House Report, in discussing the allowable adjust-

ments characterizes the market differential as a payment over and above the transportation costs, *i. e.*, a location differential, for delivery to the primary market.[13] Thus farmers would share with handlers the savings from by-passing country-station processing and handling the milk only at the city plant.

The significance of the legislative history emerges upon study of the subsequent administrative practice. The original Boston order obscures the market differential payment by providing in place of a labeled adjustment a two-price structure which allowed an additional 18¢ per cwt. for city-delivered milk over and above the costs of transporting the milk from the country plant. However, the testimony of Mr. Aplin for the Market Administrator erases any doubt that those responsible for administering the Act fully understood the meaning of the Committee's explanation of market differential.[14]

_____

[13] "The market differential is a differential which is given to the producer to compensate him for delivering his milk to a city market instead of to a country plant. These differentials vary with the markets and cannot be qualified as a 'location' differential, because of the fact that location is usually determined on the distance from a primary market whereas market differentials are usually paid in secondary markets." H. R. Rep. No. 1241, 74th Cong., 1st Sess., 10 (1935).

[14] The relevant excerpts from the hearing are included in the Joint Appendix and appear at 258–259:

"Section 4 . . . provides for location differentials. . . . Now, the price which is arrived at from the calculation of the pool is a blended price for all milk f. o. b. the market *with country station allowances deducted.* Now, Paragraph 1 [of § 4] here provides that there shall be deducted from that blended price in the case of milk delivered to a plant more than 40 miles from the State House an amount equal to the carlot freight rate from that plant to Boston, so that that deduction would be different for each freight zone, and the price would be smaller by the amount of difference in freight from each zone as we go out from the market. Now, Paragraph 2 [of § 4] provides that in the case of milk delivered from a producer

Subsequent orders have combined the country station handling adjustment, properly the market differential, and the location-transportation differential into the so-called zone differential.[15]

The statute before us does not contain a mandate phrased in broad and permissive terms. Congress has spoken with particularity and provided specifically enumerated differentials, which negatives the conclusion that it was thinking only in terms of historical considerations. The prefatory discussion in the House Report emphasizes the congressional purpose to confine the boundaries of the Secretary's delegated authority.[16] In these circumstances an administrator does not have "broad dispensing power." See *Addison* v. *Holly Hill Co.,* 322 U. S. 607, 617 (1944). The congressional purpose is further illumined by the character of the other statutory differentials for "volume,"

to a plant located within forty miles of the State House there should be added 18 cents per hundredweight. That is added for the reason that in the case of country stations there is allowed the dealers on Class I milk 20 cents a hundredweight as a country station charge, and we are allowing for containers in which to ship the milk three cents in the case of milk received at city plants, instead of having a 20 cent and a three cent deduction, which would be 23 cents. There is a receiving station allowance of only five cents. The difference is 18 cents per hundredweight. We add back in here 18 cents to the producer whose milk does not pass through a country station." (Emphasis added.)

[15] See Barnhart, *supra,* n. 6, at 620.

[16] "To eliminate questions of improper delegation of legislative authority raised by the decisions in *Schechter et al.* v. *United States,* the provisions relating to orders enumerate the commodities to which orders issued by the Secretary of Agriculture may be applicable, prescribe fully the administrative procedure to be followed by the Secretary in issuing, enforcing, and terminating orders, and specify the terms which may be included in orders dealing with the enumerated commodities." H. R. Rep. No. 1241, *supra,* at 8. See *Brannan* v. *Stark,* 342 U. S. 451, 465 (1952).

"grade or quality," "location," and "production," [17] all of which compensate or reward the producer for providing an economic service of benefit to the handler.[18]

The general language of the committee report indicating that Congress intended to carry forward the basic regulatory approach adopted under the 1933 Act, following the precedent of the 1920's, is stressed by the dissent to this opinion. This committee language, it is argued, reinforces the continuity connotations of the "customarily applied" language, a thrust that is not blunted

---

[17] In this connection it should be noted that the production differential authorized for maintaining an adequate supply for fluid use during the lean winter months is not, strictly speaking, a handler cost but a general cost of the market. It is, however, an essential cost that cannot be eliminated by looking to an alternative supplier. Viewed in this context, it is of course a cost to the handler; for in a nonregulated equilibrium market, a handler would be forced to pay a premium during the winter months when supply is limited and demand constant.

[18] "The volume differential is a differential which is paid when the operations of several country plants are consolidated into one plant. The inconvenience which is caused to producers by closing up plants to which they have been delivering and requiring that all of their milk be handled by one plant, is compensated by an additional payment to the producers. The production differential is the differential which is paid to a producer, compensating him for keeping his farm and milk qualified for a city market even though his milk may actually be going into manufactured use. . . . The production differential is a payment to the farmer for performing this *function in the market*." (Emphasis supplied.) H. R. Rep. No. 1241, *supra*, at 9–10.

In *Brannan* v. *Stark, supra*, this Court invalidated regulations providing certain payments to cooperatives that had the effect of reducing the blended price to nonmember producers. The premise underlying our holding was that these payments would have to represent compensation for rendering of economic services of benefit to all producers. Even the dissenters took as a point of departure the proposition that the payments could be sustained only if justified in terms of services rendered.

by any specific language indicating a legislative purpose to treat all farmers equally.

Legislative silence is a poor beacon to follow in discerning the proper statutory route. For here the light illumines two different roads. If nearby payments had the notoriety and significance in the milk distribution industry attributed to them by the dissent, Congress could have given its blessing by carving out another specific exception to the uniform price requirement. In an Act whose very purpose was to avoid the infirmity of overbroad delegation and to set forth with particularity the details for a comprehensive regulatory scheme, it would have been a simple matter to include in a list of enumerated differentials, "nearby" payments, or at least allude to them in the report of the draftsmen. It is clear that Congress was not conferring untrammeled discretion on the Secretary and authorizing him to proceed in a vacuum. This was the very evil condemned by the courts that the 1935 amendments sought to eradicate.[19] It would be perverse to assume that congressional drafters, in eliminating ambiguity from the old Act,[20] were careless in listing their exceptions and selecting the illustrations from the committee report from which their words would ultimately derive content.[21]

---

[19] See *Brannan* v. *Stark, supra.*

[20] "The proposed amendments, insofar as they relate to marketing agreements and orders, are primarily intended to implement and spell out in more detail and with greater freedom from ambiguity the powers which were provided for in the original act. The present language of the statute is, unfortunately, subject to serious misconstruction. This has given rise to obstacles in connection with the enforcement of the marketing agreements and licenses which have seriously endangered their successful operation." H. R. Rep. No. 1241, *supra,* at 7.

[21] The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently

We consider our conclusions in no way undermined by the colloquy on the floor between Senator Copeland and Senator Murphy upon which the dissent places such emphasis. A committee report represents the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation. Floor debates reflect at best the understanding of individual Congressmen. It would take extensive and thoughtful debate to detract from the plain thrust of a committee report in this instance. There is no indication, however, that the question of nearby differentials and the meaning of "market . . . differentials customarily applied" were precisely considered in the floor dialogue. The exchange is not only brief but also inconclusive as to meaning.[22]   Indeed, Senator Murphy apparently acqui-

---

betokens unawareness, preoccupation, or paralysis. "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard* v. *United States*, 328 U. S. 61, 69 (1946). Its significance is greatest when the area is one of traditional year-by-year supervision, like tax, where watchdog committees are considering and revising the statutory scheme. Even less deference is due silence in the wake of unsuccessful attempts to eliminate an offending interpretation by amendment. See, *e. g., Girouard* v. *United States, supra.* Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence, let alone the approval discerned by the dissent.

[22] The floor exchange is reported at 79 Cong. Rec. 11139–11140.

"Mr. COPELAND. What has the Senator to say to the suggestion that in a number of communities in up-State New York there is not a sufficient supply of milk surrounding the market to take care of the demand; therefore, milk must be brought into the market from more distant points? The provisions of the equalization which we are now discussing provide that a producer who is producing his milk on farms near to cities would receive the same price for his product as a farmer who produces his milk, say, 40 or 50 miles away from the same community.

"Mr. MURPHY. If they were embraced in the same marketing area, that would be true. Let us keep in mind what the situation is. There is a deficiency of consumer demand. There is a surplus of

esced in Senator Copeland's implied criticism of the statute for providing uniform prices for distant and nearby producers within the marketing region. When Senator Copeland pursued his inquiry, asking whether the Act recognized the higher cost for taxes on nearby lands, Senator Murphy merely recited the differential provisions of the Act and suggested that they "adopt the present practice of business," but conspicuously lacking is an affirmative statement that any specific differential covered these costs. This is not impressive legislative history especially in light of Senator Murphy's earlier agreement with Senator Copeland's statement that "[t]he provisions of the equalization . . . provide that a producer who is producing his milk on farms near to cities would receive the same price for his product as a farmer who produces his milk, say, 40 or 50 miles away from the same community," and the specific business illustrations of the House Report.

---

milk. The price is greatly depressed, and has been for 5 years. The only way in which one can determine how each one of the producers included in the plan provided here shall bear his share of the cost of effecting a higher price is to divide the milk by classification uses.

.            .            .            .            .

"Mr. COPELAND. I do not think the Senator has quite stated all the conditions. He does not take into consideration the difference in the cost of production. Taxes and values of property near the city are very much higher than in the case of property farther away from the city. The transportation differential does not compensate for the difference in cost, as I see it.

"Mr. MURPHY. If the Senator will refer to page 12, line 13, he will see that there is this qualification:

" 'Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order—'

"They adopt the present practice of business—

" '(2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.' "

## III

## SCOPE OF MARKET DIFFERENTIAL

While market differentials customarily applied need not be restricted to the sole illustration in the House Report, that illustration, taken in conjunction with the discussion of all the statutory differentials, suggests that the permissible adjustments are limited to compensation for rendering an economic service.[23] The challenged nearby differentials do not fall into this category.[24]

Nor has the Secretary advanced any economic justification for these differential payments. It is plain from the administrative record that the nearby differential was included in the original Boston order as a recognition of the favored position of nearby producers in the fluid market and as an inducement to nearby farmers to approve the Secretary's order. (J. A. 237.[25]) The only sense

---

[23] The market differential does not, strictly speaking, compensate the producer for absorbing a cost to the handler for it may be no additional cost to the producer to deliver to a city plant. A nearby farmer, for example, would not incur additional costs by delivering to a preferred city plant as opposed to a country station. The savings to the handler are nevertheless plain and the market differential should properly be viewed as an adjustment that permits the producer to share in the handler's profits resulting from reduced costs.

[24] See Kessel, *supra*, n. 12, at 65–66 (1967). After criticizing the present undercompensation for transportation costs from faraway zones as a disguised subsidy to nearby producers, resulting in an inefficient allocation of economic resources, the author draws a comparison with the nearby differential lamenting, "However weak the case for zone differentials that fail to depict transportation costs, it is infinitely stronger than the case for location differentials."

[25] The Secretary's 1964 findings include the following: "The farm location differential provisions under the present New England orders should be continued under the Massachusetts-Rhode Island order and the Connecticut order.

"A group of nine cooperative associations, which represents principally producers whose farms are located outside any of the speci-

in which the handler may be said to gain economically is by virtue of the elimination of the nearby producer as a potential competitor. While this factor is mentioned in the findings accompanying the 1937 order, it has not

fied farm location differential areas, proposed that farm location differentials be eliminated under the New England orders. Three other cooperative associations proposed that a producer whose farm is located within New England and who is presently eligible to receive a farm location differential . . . under any New England order be eligible to receive the same differential irrespective of the New England order under which his milk is pooled. Another cooperative association proposed that the farm location differentials be increased . . . .

.            .            .            .            .

". . . [F]arm location differentials have been in effect under the several New England orders since the inception of the orders. The differentials were adopted to reflect in the pricing structure of the orders historical price relationships by location which prevailed in these markets. It was found that customarily somewhat higher values, above those which normally reflected transportation costs, attached to milk produced near the principal consumption centers as compared to the market value of milk produced in the more distant areas of the milkshed.

"While considerable testimony in support of removal of the provisions was received, it was not established that the farm location differential provisions are resulting in unstable or disruptive marketing conditions which warrant their deletion from the orders at this time. Although certain marketing problems in the nearby and intermediate market areas were referred to in the testimony, these problems are not the result of production increases on farms in these areas which logically might be attributable to the higher returns to producers in these areas. Such increases have not been significantly different from those on farms not eligible for the farm location differentials." (J. A. 349–351).

There is no reason to dispute the Secretary's finding that the differentials have no disruptive effect on the market. The issue, however, is whether the provisions are authorized by statute. The Secretary's order is devoid of any economic justification and relies solely on the historical factor of the nearby producer's favorable share of the fluid use market. See also Report to the Secretary of Agriculture by the Federal Milk Order Study Committee 74–75 (1962).

been emphasized in the 1964 findings and the testimony at the 1963 hearings suggests that support in the record is indeed scant. That entry of the nearbys into the distribution market would bring unwanted competition, is irrelevant if it does not jeopardize market stability. We think the analysis of the court below was correct: if there is any economic benefit here, producers should receive their compensation directly from the handlers and not out of the marketwide pool. 131 U. S. App. D. C., at 114, 402 F. 2d, at 665.

While petitioner nearby farmers do not concede so readily the absence of economic foundation for the differential, no justifications are advanced that find any substantial support in the record. The allusion to the evenness of production on nearby farms would not justify the exclusive payment of this differential to nearby farmers. If the Secretary intended a production differential, all producers who qualify would be eligible. Some *amici* and petitioners point to higher taxes on nearby lands and opportunity costs as reason for retaining the differential. These are, admittedly, additional costs of nearby production, but they are of no concern to handlers who seek only to obtain reliably milk at the cheapest price. See Kessel, Economic Effects of Federal Regulation of Milk Markets, 10 J. Law & Econ. 51 (1967). This Court has been slow to attribute to Congress an intent to compensate for inefficient allocation of economic resources. Cf. *West Ohio Gas Co.* v. *Comm'n,* 294 U. S. 63, 72 (1935). While petitioners argue that the differential is a necessary inducement to keep the nearby farmers in business, the record does not reveal that the Secretary acted out of concern that the nearby farmers would quit the market, nor is there any evidence demonstrating the present necessity for nearby producers. In an era where efficient transportation is

available this may be of nominal concern. At most this may have been an unspoken consideration in 1937.[26]

Since the Secretary made no findings to that effect, the Court need not consider whether they would justify payment of the nearby differential in view of the legislative history indicating that the statute contemplates adjustments primarily for economic costs to handlers that are absorbed or reduced by the producers. Further if the representations of respondents are correct—and they are not without support in the record—it appears that the elimination of the 40-mile zone nearby differential payments of 46¢, even with the suspension of the intermediate differential payments of 23¢, would result in a higher uniform price to those farmers now receiving the 23¢ differential.[27]

## IV

## PRIOR DECISIONS

Our holding does not represent a departure from this Court's precedents. No opinion of this Court has ever explicitly approved the nearby differential. Reliance on *United States* v. *Rock Royal Co-op.,* 307 U. S. 533 (1939), is misplaced. This Court's refusal to invalidate the payment of a nearby differential to farmers in certain counties named in the New York order must be taken in the context of that action which was initiated by the Government against handlers who refused to obey the regulations. That decision did not repudiate the District Court's finding that the provision was "discriminatory as between producers." *Id.,* at 567. The narrow reach of our *Rock Royal* holding was recognized in *Stark* v.

---

[26] See Report to the Secretary of Agriculture by the Federal Milk Order Study Committee, *supra,* n. 25, at 75.

[27] See J. A. 455 reporting excerpts from the Secretary's decision of October 21, 1958, accompanying the order for the Southeastern New England marketing area.

*Wickard,* 321 U. S. 288 (1944), where we noted that *Rock Royal* held the handlers without standing "to object to the operation of the producer settlement fund," *id.,* at 308, except as it affected handlers.  The Court in *Rock Royal* went on to reject Rock Royal's contention that the payments placed those *handlers* without customers in the nearby counties at a competitive disadvantage.

Our attention is also drawn to the First Circuit's decision in *Green Valley Creamery* v. *United States,* 108 F. 2d 342 (1939).  As in *Rock Royal, supra,* the parties did not have standing to raise the invalidity of the nearby differential.  To the extent the First Circuit's view is contrary to our present holding, we disapprove it.

## V

## SIGNIFICANCE OF DEPARTMENTAL CONSTRUCTION

While this Court has announced that it will accord great weight to a departmental construction of its own enabling legislation, especially a contemporaneous construction, see *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965); *Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408 (1961); it is only one input in the interpretational equation.  Its impact carries most weight when the administrators participated in drafting and directly made known their views to Congress in committee hearings.  See *Power Reactor Co.* v. *Electricians, supra; United States* v. *American Trucking Assns.,* 310 U. S. 534, 539 (1940). In such circumstances, absent any indication that Congress differed with the responsible department, a court should resolve any ambiguity in favor of the administrative construction, if such construction enhances the general purposes and policies underlying the legislation.

See *American Power & Light Co.* v. *SEC*, 329 U. S. 90, 112–114 (1946).

The Court may not, however, abdicate its ultimate responsibility to construe the language employed by Congress. Those props that serve to support a disputable administrative construction are absent here. There is no suggestion in the findings, nor have the parties explained, how the present differential contributes to the broad, general purpose of eliminating crippling competition. Nor in the present case has the Court's attention been drawn to any hearings that suggest that Congress acted with the particular administrative construction before it in either 1935 or 1937. And if those administrators who participated in drafting the 1935 Act understood market differentials to encompass the farm location differential, they obviously failed to communicate their understanding to the drafters of the committee report. It is also evident that the 1937 re-enactment of the 1935 amendments was routine and did not follow a comprehensive review of the issues that had been explored in detail by the 1935 draftsmen who wrote the committee reports.[28]

It is true that a report from the Federal Trade Commission set forth the computations employed under the 1936 Boston order which apparently provided for a

---

[28] Judge Frank expressed the view in *Queensboro Farm Prods.* v. *Wickard*, 137 F. 2d 969 (C. A. 2d Cir. 1943), that Congress intended to adopt the intervening administrative interpretation of the "use" language of § 8c (5) (A) by its 1937 re-enactment. The construction of the "use" provision may well have caused more concern than the interpretation of the § 8c (5) (B) differentials. In any event, Judge Frank's assumption that Congress gave "careful consideration . . . in connection with a re-enactment," 137 F. 2d, at 977, is not supported by citation to specific legislative history that would indicate that Congress had in mind specific problems in connection with the administration of the marketing provisions.

nearby differential.[29] But the stark figures, set forth in the appendix to the report without explication, can hardly be said to have given the administrative construction the "notoriety" that this Court found persuasive in *Udall* v. *Tallman,* 380 U. S., at 18. In *Udall* the Court was impressed by the fact that the Secretary's interpretation had "been a matter of public record and discussion." *Id.,* at 17. Even despite active congressional involvement in reviewing certain administrative action in connection with particular leases, the Court noted that it would not attribute ratification to Congress. *Udall* v. *Tallman, supra.* Nor can petitioners put flesh on this argument by citing § 4 of the 1937 re-enactment, 50 Stat. 249,[30] and the committee report, H. R. Rep. No. 468, 75th Cong., 1st Sess., 4 (1937), which merely states in the language of the Act that § 4 purports to ratify, legalize, and confirm all action taken pursuant to the agreement and order provisions under the 1935 statute.[31]

---

[29] The 1936 order provided for payment of a uniform price subject to adjustments and with a special exception for "any producer, whose farm is located within forty (40) miles of the State House in Boston *and* who delivers milk to such handler at a plant located within forty (40) miles of the State House in Boston, at $3.30 per hundredweight for that quantity of milk delivered by such producer not in excess of the base of such producer." (Emphasis supplied.) Art. VIII, § 1 (2).

[30] Section 4 of the Act provided:

"Nothing in this Act shall be construed as invalidating any marketing agreement, license, or order, or any regulation relating to, or any provision of, or any act of the Secretary of Agriculture in connection with, any such agreement, license, or order which has been executed, issued, approved, or done under the Agricultural Adjustment Act, or any amendment thereof, but such marketing agreements, licenses, orders, regulations, provisions, and acts are hereby expressly ratified, legalized, and confirmed."

[31] To the extent that Congress could be said to have acted against the background of the 1936 order, the Court must reject petitioners' argument. The 1936 order was superseded by the 1937 order which differed in approach. The provision for nearby differentials in the

## VI
## RELEVANCE OF PRODUCER APPROVAL

Petitioners allude to the fact that the orders in question have been specifically approved by the farmers concerned as required by §§ 8c (9)(B)(i) and (ii) of the Act.[32] While the contention is adumbrated, the argument appears to run as follows: since provision is made for approval of orders by the regulated subjects, the Secretary's discretion should be generously inter-

---

1936 order was obscured by allowing a more favorable total price to nearby producers. See n. 29, *supra.* The 21¢ differential incorporated in the 1937 order for the benefit of intermediate nearby zones was not included in the 1936 order. The 21¢ differential provided in Art. VIII, § 4 (2), of the 1936 order could have been viewed as a true market differential since its payment depended on delivery to a handler within a 40-mile zone from a producer beyond a 40-mile zone. Further, as noted by the court below, § 4 is typical of statutory boilerplate traditionally included in legislative re-enactments, to avoid breaks in regulatory continuity. 131 U. S. App. D. C., at 119, 402 F. 2d, at 670.

[32] Section 8c (9) of the Act, 7 U. S. C. § 608c (9), provides that no order shall become effective until the Secretary determines:

"(B) That the issuance of such order is the only practical means of advancing the interests of the producers of such commodity pursuant to the declared policy, and is approved or favored:

"(i) By at least two-thirds of the producers . . . who, during a representative period determined by the Secretary, have been engaged, within the production area specified in such marketing agreement or order, in the production for market of the commodity specified therein, or who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order, or

"(ii) By producers who, during such representative period, have produced for market at least two-thirds of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or who, during such representative period, have produced at least two-thirds of the volume of such commodity sold within the marketing area specified in such marketing agreement or order."

preted. If provision for such approval could ever legitimize a regulation not authorized by statute, the provision has no significance in the case before us, in light of the considerations already discussed. It is the Secretary, not the farmers, who is responsible for administering the statute and initiating orders.[33]

## VII

## PROPRIETY OF SUMMARY JUDGMENT

Although the Secretary does not press the point, the private petitioners argue that this Court should at the very least reverse for a trial on the merits or alternatively reverse with instructions to remand to the Secretary for further consideration.

This is not a case where a department has acted without a formal record. In such instances a trial might be appropriate to afford the department an opportunity to develop those facts which underpin its action. When action is taken on a record the department cannot then present testimony in court to remedy the gaps in the record, any more than arguments of counsel on review can substitute for an agency's failure to make findings or give reasons. A remand to the Secretary is inappropriate in the absence of a request by the Government. Counsel for the Department has advanced no new theory for sustaining the order. Cf. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 92 (1943).

Unlike *Addison* v. *Holly Hill Co.*, 322 U. S. 607 (1944), we do not have before us a definition in a regulation that is necessary to give meaning and content to the admin-

---

[33] Lower courts have, in some circumstances, permitted an agency to rely on the approval of those affected by an action as evidence that the action is in the "public interest." Compare *Citizens for Allegan County* v. *FPC*, 134 U. S. App. D. C. 229, 414 F. 2d 1125 (1969), with *Marine Space Enclosures* v. *FMC*, 137 U. S. App. D. C. 9, 420 F. 2d 577 (1969). We need not consider what scope, if any, may be given to these principles.

istrative scheme. Nor does our decision have the effect of engrafting a definition on a particular statutory term, a function that should, in the first instance, be left to the appropriate administrative body. The 1964 order, moreover, expressly provides for severance of any provision that is found invalid. See 7 CFR § 1001.96.

## VIII

## DISPOSITION OF THE ESCROW FUND

Petitioner farmers' last line of retreat is their contention that they are entitled to escrow monies that have been accruing since the District Court's entry of the order granting the respondents' motion for a preliminary injunction. The court below struck an equitable balance in awarding to petitioners, nearby farmers, all escrow monies collected prior to the entry of final judgment by the District Court. This is a fair solution, and one this Court will not disturb. Petitioners have been on notice since *Blair* v. *Freeman,* 125 U. S. App. D. C. 207, 370 F. 2d 229 (1966), that nearby differentials were bottomed on a shaky statutory premise. Lest losing parties be encouraged to prolong litigation by frivolous appeals in order to reap a windfall, we think respondents deserve the fruits of their victory as of the date of final judgment at trial.

The judgment below is

*Affirmed.*

THE CHIEF JUSTICE and MR. JUSTICE MARSHALL took no part in the consideration or decision of these cases.

MR. JUSTICE BLACK, with whom MR. JUSTICE WHITE joins, dissenting.

The central question in this cause is whether a provision in the Secretary of Agriculture's Boston milk market regulation which provides that farmers close to Boston

will receive a higher price for their milk than farmers farther away is valid under the Agricultural Marketing Agreement Act of 1937, as amended, 50 Stat. 246, 7 U. S. C. § 601 *et seq.* (1964 ed. and Supp. IV). The majority concludes that this higher payment can be sustained only if it represents "compensation for rendering an economic service," *ante,* at 188, and then holds that since the Secretary has not provided such an economic justification for this payment, it is invalid. The effect of affirming the judgment below is that challenged payments which have been placed in a special fund since June 1967 and now amount to over $8,000,000 will be distributed to all farmers selling milk in the Boston market instead of only those located near Boston. This represents a drastic change in the distribution of the income from the sale of milk since only the nearby farmers have received these additional payments for at least 30 years. My study of the legislative history convinces me beyond any doubt that this result is wrong and in direct conflict with the intent of Congress as expressed in the Agricultural Marketing Agreement Act and its predecessors. In my opinion Congress intended to permit the Secretary to regulate the milk industry in accordance with the practices that had developed in that industry prior to the first federal regulation in 1933 and did not intend to eliminate the economic advantages that specific groups had enjoyed in the past. Since it is clear beyond a doubt that farmers near Boston received more for their milk than did other farmers prior to federal regulation, I would reverse the judgment below and hold this provision of the Boston milk order valid.

In order to understand the purpose of the 1937 Act, it is necessary to go back to the 1920's at a time prior to any federal regulation. As the majority correctly points out, the economics of the milk industry at that

time often led to destructive competition and chaos. Milk producers therefore formed cooperatives for their own protection and sold milk on a collective basis. All the parties in this case agree, and the record conclusively shows, that under the cooperatives at that time farmers close to marketing centers received more for their milk than did farmers farther away. This higher price resulted from many factors, including the greater proportion of milk from nearby farms that was used for fluid purposes, the possibility that those farmers would compete with handlers by selling directly to customers, smaller seasonal variation in the volume of milk produced, and higher costs—such as taxes and land values—incurred in farming close to the cities.[1]   As long as economic conditions remained generally stable, the cooperatives succeeded in protecting all farmers from the dangers of overproduction and excessive competition. Then the depression set in and milk farmers, like so many other Americans, were unable to maintain stable prices by self-regulation.   Congress reacted to this situation by passing the Agricultural Adjustment Act of 1933 (A. A. A.), 48 Stat. 31, under which the Secretary of Agriculture was given broad powers to regulate the farm economy through licensing.   *Id.*, § 8 (3), 48 Stat. 35.   Very few details or standards describing the Secretary's powers were provided in the 1933 Act, and there was no attention given to specific problems of

---

[1] The majority implies, *ante*, at 181, that this higher price in the 1920's was an economic "distortion." There has been no such finding by the Secretary or any of the courts below, nor was any evidence taken that was directed at this issue. This Court is poorly equipped to pass judgment on the economic validity or invalidity of this higher price, surely not as well equipped as the Secretary and the economists who advise him. It is the Secretary, not this Court, to whom Congress has delegated the task of fixing the prices producers will be paid for their milk and of making the underlying economic judgments.

nearby farmers in the milk industry. Under the provisions of that Act the Secretary issued a license for the Boston market in 1933 and this first license included provisions that effectively maintained the historical price advantage of producers close to Boston.[2] In 1935 bills were introduced in Congress to amend the A. A. A.[3] and hearings were held on those bills in February and March of that year.[4] In May 1935 this Court held in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, that provisions of the National Industrial Recovery Act, 48 Stat. 195, were unconstitutional, in part because that Act delegated powers to an administrative agency without providing adequate standards and guidelines. The congressional committees considering the amendments immediately recognized that the *Schechter* decision cast considerable doubt on the validity of the A. A. A. and they therefore reported out a completely amended bill which set forth detailed descriptions of the powers and standards that the Secretary was to employ.[5] As reported and passed by Congress, that bill contained specific provisions concerning the milk industry, and it is those provisions that are involved in the present case.[6] The committee reports accompanying that bill make it abundantly clear that a primary pur-

---

[2] This license adopted a somewhat complicated base-rating plan similar to that used by the milk cooperatives. See n. 4, *ante,* at 173–174. There is general agreement among the parties that these licenses effectively resulted in higher milk prices to nearby farmers, and the Court of Appeals recognized this fact. 131 U. S. App. D. C. 109, 113–114, 402 F. 2d 660, 664–665.

[3] H. R. 5585, S. 1807, 74th Cong., 1st Sess.

[4] Hearing on H. R. 5585 before the House Committee on Agriculture, 74th Cong., 1st Sess.; Hearings on S. 1807 before the Senate Committee on Agriculture and Forestry, 74th Cong., 1st Sess.

[5] H. R. 8492, 74th Cong., 1st Sess.

[6] These provisions of the 1935 amendments have been carried forward, virtually without change, into the present statute.

pose of the bill was to "eliminate questions of improper delegation of legislative authority raised by the decision in *Schechter* . . . ." [7] There is no indication that when Congress passed those amendments it intended to cut back on or limit the authority the Secretary had actually exercised in regulating milk under the 1933 Act, but rather the purpose was to avoid judicial invalidation resulting from the absence of constitutionally sufficient standards. History and the legislative record make it quite clear that Congress in 1935 was concerned, not about limiting an excessively aggressive Secretary, but about overcoming the limitations imposed by a Court that was frustrating the congressional purpose by holding laws unconstitutional. Pursuant to the 1935 Act, the Secretary issued a new order in 1936 for the Boston market which, like the 1933 order, contained provisions for additional payments to nearby farmers. In issuing this order he explicitly relied on the historical, economic factors which justified these additional payments. (J. A. 224.) The effectiveness of the 1935 amendments was also jeopardized by court decisions,[8] and Congress again acted by passing a new law, the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246. This statute re-enacted the milk marketing provisions of the 1935 Act in substantially the same form and further provided that all market orders issued under that Act were "expressly ratified, legalized, and confirmed." 50 Stat. 249. Proceeding under the new Act the Secretary reinstated the 1936 Boston order including the additional

---

[7] S. Rep. No. 1011, 74th Cong., 1st Sess., 8; H. R. Rep. No. 1241, 74th Cong., 1st Sess., 8.

[8] In *United States* v. *Butler*, 297 U. S. 1 (1936), this Court declared the processing tax provisions of the A. A. A. invalid, and some district courts then held that the entire Act was invalid. *E. g.*, *United States* v. *David Buttrick Co.*, 15 F. Supp. 655 (D. C. Mass. 1936), rev'd, 91 F. 2d 66 (C. A. 1st Cir.), cert. denied, 302 U. S. 737 (1937).

payments to farmers located nearer the city, and that order and the 1937 Act have remained in substantially the same form until this time. With this general historical picture in mind, it is easier to answer the central legal question in this case which is whether the 1937 Act authorizes the Secretary of Agriculture to provide that nearby farmers will receive more for their milk than farmers farther away.

The Act provides that the Secretary shall establish by order certain basic prices for milk delivered by producers and allows him to adjust that basic price to reflect "volume, market, and production differentials customarily applied by the handlers subject to such order . . . ." 7 U. S. C. § 608c (5)(B), cl. (a) (1964 ed., Supp. IV).[9] The Secretary here argues that the payment of additional sums to farmers close to Boston is an authorized "market differential." The argument cannot be settled simply on the basis of the statutory language since there is no definition of the term "market." However the legislative history makes it clear beyond any doubt that this provision was designed to allow the Secretary broad leeway in regulating the milk industry in accordance with prior practices and differentials in the unregulated market. The committee reports in both Houses said that the milk order provisions in the Act were designed to "follow the methods employed by cooperative associations of producers prior to the enactment of the Agricultural Adjustment Act and the provisions of

---

[9] This language was first enacted in the 1935 amendments to the A. A. A., but was re-enacted in the 1937 Agricultural Marketing Agreement Act without change. There is no relevant legislative history for the 1937 Act, but the parties all agree that the history of the 1935 amendments also applies to the 1937 Act. The discussion of legislative history in the text is based on the 1935 legislative record.

The complete text of the relevant portions of the present statute is set forth in n. 8, *ante*, at 176–177.

licenses issued pursuant to the present section 8 (3) of the Agricultural Adjustment Act." [10] The only discussion of these provisions during the congressional floor debates fully supports this statement. Senator Copeland, a former commissioner of health in New York City and a man well acquainted with the milk industry in New England, asked Senator Murphy, the floor manager for the bill, about the possibility that farmers near the cities would receive the same price for milk as farmers farther away. Senator Murphy's initial answer indicated this would be so, but when Senator Copeland pressed the inquiry further, stating that not all factors had been considered, Senator Murphy indicated that the provisions for specific differentials "adopt the present practice of business." [11] To me that reply indicates that nearby differentials would be permissible, if they were part of the business practice—as they were. The majority diminishes the importance of this discussion by saying that it represents the views of only two men, not those of the committee, but anyone acquainted with the realities of the United States Senate knows that the remarks of the floor manager are taken by other Senators as reflecting the views of the committee itself. This history makes it clear that Congress did not intend to limit the authorized differentials to any specific payments, but rather intended to permit the Secretary to employ whatever practices, consistent with the history of the unreg-

---

[10] S. Rep. No. 1011, 74th Cong., 1st Sess., 9; H. R. Rep. No. 1241, 74th Cong., 1st Sess., 9. This basic purpose is reflected in the fact that Congress provided the Secretary with three different schemes of regulation, each of which followed a variety of regulations used by the milk cooperatives. See n. 10, *ante,* at 177. In 1965 Congress followed this same basic purpose when it amended the Act to make explicit the Secretary's power to employ base-rating plans, described in n. 4, *ante,* at 173–174. See 79 Stat. 1187, 7 U. S. C. § 608c (5) (B), cl. (d) (1964 ed., Supp. IV).

[11] The full discussion is set out in n. 22, *ante,* at 186–187.

ulated market, he found necessary to achieve stability in the milk industry.

Applying these considerations it becomes plain that the additional payments to nearby farmers are authorized as a "differential customarily applied." Nearby farmers had always obtained a higher price for their milk than farmers farther away and the Secretary's regulations in 1933 and 1936 reflected this historical fact. Reinstatement of the nearby differentials after passage of the 1937 Act merely continued this prior administrative practice, based on the earlier economic realities, of paying more for milk produced on farms close to Boston. Had Congress intended to eliminate this feature of the prior practice, it would have been easy to say so, but there is absolutely nothing in the statute or in the legislative history that demonstrates a desire to alter the advantage nearby farmers had always enjoyed.

My conclusion that this differential is authorized is buttressed by the actions of Congress and the Secretary since 1937. There has always been a healthy controversy among farmers about this differential, and extensive hearings in 1963 brought forth strong arguments against continuing it. (J. A. 360–599.) Yet Congress, even though it amended the statute in 1965, 79 Stat. 1187, still has not in any way indicated that the nearby differential was unauthorized by the 1937 Act or that it should be eliminated at this time. Similarly the Secretary has continually reviewed this provision and refused to eliminate it, the most recent time being 1964. (J. A. 346, 349.) Since Congress, in my view, intended in 1933, 1935, and 1937 to authorize payments like the nearby differential and since it has not altered this authorization in the past 32 years, I cannot agree that this Court should or properly can eliminate the payment, ostensibly through a process of statutory interpretation.

This interpretation is not based on a theory of legislative silence as the majority seems to imply. To me the legislative history speaks clearly in saying that Congress intended the Secretary to regulate the industry in accordance with prior practices, and the statutory language, statements in committee reports, and floor debates do not "illumine two different roads," *ante,* at 185. I see only one path that is marked by the legislative record, and the only silence I perceive is the striking absence of any statements in the statute or the legislative history that support the majority's interpretation.

My conclusion that the location differential is authorized by the Act finds support in other judicial decisions. In *United States* v. *Rock Royal Co-op.,* 307 U. S. 533 (1939), certain milk handlers made a broadside attack on the New York order issued under the 1937 Act. This Court rejected that challenge. One part of the argument was that the nearby differential provision of that order was invalid. This Court noted that "[t]he Act authorizes such an arrangement," citing the provision for market differentials customarily applied. *Id.,* at 567. Although that provision was promulgated under § 8c (5)(A) of the Act, the identical language supporting that conclusion is found in § 8c (5)(B), and it is that latter section which is involved in the present case. The majority attempts to distinguish that case by noting that it was a suit brought by the Government against handlers, but it is difficult to see what difference that makes. It does not matter who sues, if the Court decides an issue of statutory interpretation that decision should remain the same even if the litigants change.[12]

---

[12] The majority also seems to imply, *ante,* at 191–192, that *Rock Royal* did not decide this issue since the handlers did not have standing to raise it. It seems to me that the Court there did decide that the handlers, who argued that the nearby differential reduced their own profits, could raise this issue.

The nearby differential of the Boston order involved here was also approved by the First Circuit in *Green Valley Creamery* v. *United States,* 108 F. 2d 342 (1939). The majority's dismissal of that case on the conclusion the handlers did not have standing to raise this issue is irrelevant. The First Circuit there found the differential valid and then stated that "[f]urthermore" the handlers lacked standing. *Id.,* at 346. It does not matter to me whether the decision on the validity of the location differential is classified as dictum or a holding. The point remains that the First Circuit considered these payments and found them expressly provided for by the language of § 8c (5)(B). *Ibid.*

The majority disagrees with the interpretation of the statute set forth above and instead finds that the foundation of the portion of 1937 Act involved here was to provide uniform prices to all producers, with adjustments to that uniform price only as "compensation for rendering an economic service." *Ante,* at 188. This interpretation, as I understand it, would require the Secretary to disregard the historical price advantage nearby producers had in the sale of their milk, and to consider only whether there is a present economic justification for particular payments. I respectfully submit that this interpretation cannot be supported by the language of the Act considered as a whole or by the relevant expressions of congressional intent found in the legislative history. The theory of this Act adopted by the majority is clearly not that of Congress, but one created by the Court itself.

The conclusion that each of the differentials specified in the Act represents only "compensation for rendering an economic service" finds no support whatsoever in the language of the Act or the legislative history. None of the adjustments described in the Act is defined in terms of any "economic service." The majority does not refer

to any legislative history that indicates such a defini-
tion was intended. It may well be possible for an ana-
lyst to fit the language of the Act, the committee
reports, and the floor debates into a coherent pattern of
economic services, but had Congress desired to require
this as a touchstone for the authorized differentials, it
would have been easy for it to have said so. Congress
did not choose to do so in 1933, 1935, or 1937, and it has
not done so in the intervening 32 years. Moreover, if
there is any pattern into which all the differentials clearly
fit that is fully supported by express legislative history, it
is the clear pattern of allowing the Secretary to incor-
porate provisions reflecting the customary practices of
the milk industry itself.[13]

Even if the majority's statutory interpretation were
correct, I do not understand why it would lead to the con-
clusion that the judgment below should be affirmed and
the challenged payments distributed at this time to all
farmers. Until this Court's decision the Secretary had

---

[13] In a footnote, n. 18, *ante,* at 184, the majority implies that
there is support for this novel interpretation in our prior decision
in *Brannan* y. *Stark,* 342 U. S. 451 (1952), which held invalid a
provision in the Boston milk order that distributed certain sums to
producer cooperatives. That case specifically held that such pay-
ments were not authorized by the catchall provision in the Act per-
mitting provisions in milk orders "[i]ncidental to, and not inconsist-
ent with, the terms and conditions specified in [other sections] and
necessary to effectuate the other provisions of such order." 7 U. S. C.
§ 608c (7) (D) ; *Brannan,* at 457–458. It is true that the majority
there did decide that the challenged payments did not represent
compensation for an economic benefit received by all producers,
but regardless of the validity of that decision, it is irrelevant to the
decision in this case. It may be that payments that are sought
to be justified solely on the basis of the "necessary provisions"
section require independent economic justification, but that cer-
tainly does not mean that where the Secretary relies on a specific
adjustment set forth in the Act, as he does here, he must also
defend it on economic grounds.

no reason to know that he had to justify the provisions of this order as "compensation for rendering an economic service," and his failure to have provided such a defense does not necessarily mean it is unavailable. Indeed the Court apparently would approve this same provision were the Secretary to issue it again, but only if it were then accompanied by an economic study that this Court—composed of lawyers, not economic or agricultural experts—finds acceptable. If such a justification is present, the differential is in fact lawful at this time, and it would not seem to matter that the Secretary has not yet incanted the proper magic words.

I do not see what harm would follow if this Court were simply to vacate the judgment below, remand the cases to the Secretary for appropriate study, and continue to place the payments in the special fund pending ultimate resolution of the controversy. If the Secretary cannot make the proper economic justification, the only result would be to postpone the day when the accumulating funds, which now amount to over $8,000,000, would be distributed. If, on the other hand, he is able to show that these payments compensate for an economic service, then the Court would not have unnecessarily given the accumulated millions to farmers who are not legally entitled to receive them.

My conviction that the Act was designed to permit the Secretary to include adjustments that reflected the prior practice of the milk industry does not mean that he can act with unlimited abandon and approve a payment simply because historically it was provided for prior to federal regulation. The statute requires that the Secretary issue orders which "will tend to effectuate the declared policy of [the Act] . . . ." 7 U. S. C. § 608c (4). Those policies are specifically set forth, 7 U. S. C. § 602, and in general provide that orders should establish and maintain orderly marketing condi-

tions and parity prices for milk producers. In his latest promulgation of the Boston order the Secretary specifically refused to eliminate the nearby differentials (J. A. 349–357) and found that the order "will tend to effectuate the declared policy of the Act." 29 Fed. Reg. 12236. That finding cannot be disturbed, nor the nearby differential invalidated, unless it is shown that the order is not supported by substantial evidence in the administrative record considered in its entirety. Cf. *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474 (1951). In this action the Court of Appeals did not make a specific finding on the substantiality of the evidence, and the respondents argue that it is insubstantial, but a review of the entire record in light of the appropriate legal standards indicates that the nearby differential in the Boston order is fully supported by substantial evidence.

In reaching this conclusion, it must be remembered that the Secretary is required to find only two things. First, that the proposed provision represents a payment customarily applied in the milk market, and second, that inclusion of the proposed provision will further the policies of the Act. The first of these questions is essentially a factual one, and there is no real argument in this action that the Secretary was wrong in finding as a matter of historical fact that nearby farmers received additional payments which are reflected in the location differential. The respondents do not really deny the historical existence of this higher price, but rather attack its legality under the Act. The Court of Appeals, moreover, specifically recognized the historical fact that such differentials existed, but accepted the respondents' argument that they were illegal. 131 U. S. App. D. C., at 112–114, 118, 402 F. 2d, at 663–665, 669. An independent review of the record confirms the conclusion that such differentials had been customary in the market. It is thus easy to conclude that the factual finding

required by the Act has been supported by substantial evidence in the administrative record.

The second required finding, that the provision will further the policies of the Act, is a mixed question of fact and administrative policy. The Secretary has held extensive hearings in the past on the provisions of the Boston milk order (J. A. 233–247, 257–302, 305–330, 360–651), and he has repeatedly found that the nearby location differential furthers the policies of the Act. Since this is essentially a question of administrative discretion and will be set aside only on a strong showing by the parties that the finding is without support in the basic facts on which the Secretary has relied, it is proper to say on this record that this second finding is adequately supported. Nothing in the respondents' arguments indicates that the nearby differential does not further the policies of the Act, but rather they argue only that elimination of the differential would better serve those policies. But this question is one for the Secretary, not for the parties or for this Court, to decide.

What is involved here is simply a question of interpreting and following the will of Congress. Over 30 years ago Congress decided that milk producers needed governmental assistance in stabilizing their income, but it also decided that this stabilization should be accomplished with a minimal amount of change in the industry's prior practices. Congress therefore authorized the Secretary of Agriculture to regulate the industry and left most of the details to him. For over 30 years he has used his authority to regulate the Boston milk market, and has consistently found it desirable to provide higher prices for milk produced on farms close to Boston. It may well be that this decision is not the best or the most economically sound one that he could make in light of changed economic conditions in 1969, but that decision is one Congress has committed to the Secretary alone. In my view

this Court and the Court of Appeals in this litigation effectively substitute their will for the will of Congress and their views of economics and wise administration for those of the Secretary whom Congress selected to carry out its will. The Court indicates that its decision will avoid a "windfall." *Ante,* at 197. In fact the Court itself creates a windfall of over $8,000,000 which is siphoned out of the pockets of farmers close to Boston and bestowed like a Christmas present on those farther away. This the Court does contrary to the informed judgment of the Secretary who, faithful to the Act, has declared for years that distant farmers are not eligible for such a bonus. I am unable to agree that this is a proper function for the Court to perform and I therefore dissent.