CENTRAL BANK, NATIONAL ASSOCI-ATION, a corporation, Plaintiff,

v.

FEDERAL HOME LOAN BANK OF SAN FRANCISCO et al., Defendants.

No. C–76–2725 SC.

United States District Court, N. D. California.

April 15, 1977.

Robert M. Westberg, Pillsbury, Madison & Sutro, San Francisco, Cal., R. L. Heggen, Oakland, Cal., for plaintiff.

William E. Trautman, Chickering & Gregory, San Francisco, Cal., Daniel Goldberg, George L. Christopher, Washington, D. C., for defendants.

## OPINION

CONTI, District Judge.

This action is brought by Central Bank, a commercial banking institution, which is seeking (1) a declaratory judgment that the defendant Federal Home Loan Bank of San Francisco (FHLB) is without authority under the Federal Home Loan Bank Act, 12 U.S.C. § 1421 *et seq.*, to engage in the business of money order banking, and (2) a permanent injunction to FHLB barring it from engaging in such business. Defendant FHLB has moved for dismissal on grounds of lack of subject matter jurisdiction and failure to state a claim, or, alternatively, for summary judgment. Plaintiff Central Bank seeks a partial summary judgment on the issue of FHLB's authority to engage in money order banking, and the issue of whether a new contract between FHLB and United California Bank (UCB) placed FHLB in the money order banking business. The court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1361 and 2201, and 5 U.S.C. § 701 *et seq.*

## FACTS

There are twelve regional Federal Home Loan Banks. These are federal institutions which were created during the Depression to provide a long-term and continuous supply of mortgage credit to the nation's homeowners and to establish, encourage and serve their member savings and loan associations (S&Ls). Notwithstanding the word "Bank" in their name, the Federal Home Loan Banks are not "banks" in the general commercial sense, but are institutions of limited power, being expressly forbidden by statute from engaging in "banking or other business" not authorized by the Federal Home Loan Bank Act. 12 U.S.C. § 1431(e). Essentially, they function as reserve banks to supply both short and long term funds to member thrift institutions and to assure the financial soundness and integrity of their members.

The FHLBs are expressly authorized, among other things, to provide "advances" or loans to member institutions upon the security of home mortgages, and "to accept deposits made by members of such [FHLB] . . . upon such terms and conditions as the [Federal Home Loan Bank B]oard may prescribe." *Id.* §§ 1430, 1431(e). In addition to their express powers, the FHLBs may "do all things necessary for carrying out the provisions of [the Act] and all things incident thereto." *Id.* § 1431(a).

The Federal Home Loan Bank Board first authorized a money order service in 1944, and member institutions of the FHLB of New York began issuing money orders drawn on that bank in 1947. In 1971, the Board suggested to the FHLB of San Francisco that it also begin issuing money orders, a service which by that time was being offered by all eleven other regional FHLBs. In January, 1972, the FHLB of San Francisco signed a "Money Order Servicing Agreement" with plaintiff Central Bank whereby Central Bank agreed "to act as servicing agent for the [FHLB] in connection with Federal Home Loan Bank of San Francisco Money Orders to be offered by the [FHLB] to customers of its member savings and loan institutions . . .," such money orders to be sold solely from the offices of the Member Institutions but to carry the name of the [FHLB] as drawee."

Member S&Ls obtained the right to sell FHLB money orders by executing a "Money Order Sales Outlet and Trust Agreement" with FHLB whereby, "for the sole purpose of selling Federal Home Loan Bank of San Francisco Money Orders," the S&L was appointed as FHLB's trustee and designated as a sales outlet. Each S&L agreed to hold any money orders delivered to it in trust for FHLB; to sell and issue these money orders in accordance with instructions of FHLB; to hold for the account of FHLB any money received by their sale; to be responsible for safeguarding the money orders; to prepare designated reports; and

to deliver to FHLB on demand any unsold money orders. Each money order sold was signed by the S&L as drawer, and the FHLB was identified on the form as drawee. The money orders were encoded with Central Bank's routing number. Purchasers made any requests for stop payment not to the FHLB but to the seller S&L, which then determined whether the request should be honored.

Under the terms of its contract with FHLB, Central Bank acted as processing agent for all FHLB money orders sold. Money orders sold to customers of a S&L would ultimately be presented to Central Bank for collection. Meanwhile, the seller S&L would have transmitted the proceeds of its sale to Central Bank. Central Bank would pay all money orders as they were presented, and settle with FHLB on a daily basis for any net debit or credit resulting. Central Bank provided the S&Ls with all money order forms, the check writer machines, and performed all necessary accounting operations. At the close of 1976, Central Bank was paying and processing more than 500,000 money orders per month sold through over 900 offices of savings and loan associations.

For its services, FHLB paid Central Bank eight cents per money order sold. In turn, FHLB charged member S&Ls one cent per money order. This charge was raised or lowered periodically to provide a margin of profit; the FHLB considered its charge to be "competitive with similar services, such as that provided by American Express."

FHLB also obtained income from interest on the outstanding balances of money order sales income deposited with Central Bank. In 1975, this amounted to $315,940. The FHLB nonetheless suffered a net loss in 1975 of $40,138, which it attributed mainly to the high cost of processing money orders through Central Bank. It estimated that if the money orders were processed "in-

house," i. e., by assuming all processing functions itself, it could reduce costs so as to obtain a conservatively estimated profit of more than $200,000 per year.

In January, 1977, Central Bank's contract with FHLB expired, and was not renewed. FHLB did not refuse to renew the old contract because of any great dissatisfaction with Central Bank's performance, but rather because it desired to implement new processing procedures which Central Bank regarded as effectively constituting an entry by FHLB into the money order banking business. FHLB therefore executed a one-year "Money Order Processing Agreement" with United California Bank whereby UCB agreed "to act as processor for FHLB in connection with money orders drawn on the FHLB by its member savings and loan associations . . . ."

Under the terms of this new contract, money orders are now encoded with the FHLB routing number; they continue to show the seller S&L as drawer and the FHLB as drawee. The processing agent, UCB, performs routine accounting functions and pays money orders when presented, but it does not receive directly from the S&Ls the proceeds of the money order sales as did Central Bank. Instead, the S&Ls are required to maintain an adequate demand deposit account with the FHLB to cover payment for money orders they sell; UCB debits the FHLB account maintained at its bank, and FHLB in turn settles with the S&Ls by debiting their FHLB accounts.[1] Central Bank contends that these new procedures so intimately involve the FHLB in money order sales as to amount to the business of money order banking. Central Bank also contends that certain accounting information now required to be furnished to FHLB was required for the purpose of allowing FHLB to take over UCB's accounting and processing functions completely when the UCB contract expires.

1. In 1973, the FHLB selected UCB as its principal correspondent bank. As such, UCB services FHLB's general operating account, collects, maintains and pays funds from the demand accounts of member S&Ls, provides custodial services for investment securities pur-

chased by FHLB, and provides a direct hookup to UCB's wire transfer room. Accordingly, most of the money order transactions outlined above occur at UCB, but FHLB maintains its own books for member demand accounts.

Central Bank filed suit, and advised the savings and loan institutions it had served that it considered the new FHLB activity to be illegal. In order to provide continuity of service to the S&Ls should the FHLB's system be overturned in the courts, Central Bank offered its own money order service. At least one savings and loan association has rejected the FHLB money order system in favor of Central Bank's service.

It may be further noted that issuance of money orders is not a function confined to commercial banking organizations. Non-banking entities such as American Express, Travelers Express, the United States Postal Service, Western Union, and Citicorp Services, Inc., all issue money orders. Together, they issue a major share of all the money orders sold. Likewise, accounting, processing and account reconciliation are not functions unique to the banking industry.

## MOTION TO DISMISS

Defendant FHLB contends that the court lacks subject matter jurisdiction because no case or controversy is before the court, and that Central Bank has failed to state a claim upon which relief can be granted. It argues that the changes made by its new contract with UCB are not material to any question of its powers or to an interest assertable by Central Bank, since in defendants' view they amount to no more than a streamlining of bookkeeping procedures. Even were the court to find that the new procedures should be abandoned and that the FHLB should revert to those followed under the Central Bank contract, such relief would not serve to protect any substantial, direct and legally protectable interest of plaintiff Central Bank. *See Doremus v. Board of Education*, 342 U.S. 429, 434, 72 S.Ct. 394, 96 L.Ed. 475 (1952); *Massachusetts v. Mellon*, 262 U.S. 447, 486–87, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

The court believes defendant FHLB construes plaintiff's complaint too narrowly. Central Bank does not seek merely to compel FHLB to alter its bookkeeping arrangements, but to obtain a declaration and determination by the court that FHLB has entered into the money order banking business in direct competition with it.

Central Bank further seeks a declaration and determination which would remove existing uncertainty regarding the law affecting such money order banking services, and which would resolve its controversy with FHLB as to the nature and extent of federal home loan bank activity authorized by the Act with respect to money order banking services. Specifically, it contends that defendant FHLB "may not enter into the business of providing such banking, accounting or processing services with regard to money orders and may not provide such services or any of them."

■ As a financial institution active in the money order banking business, and a business offering services virtually identical to those offered by FHLB, Central Bank certainly has standing to assert its claims. If it is correct in its contention that FHLB's activities have placed it in the money order business, and that the FHLB is barred from such activities, the court can fashion appropriate relief. A "case and controversy" is established, and since, as hereafter explained, the court finds Central Bank's interest to be legally protectable, an injury that is substantial and direct is adequately asserted. Defendants' motion to dismiss is denied.

## CROSS–MOTIONS FOR SUMMARY JUDGMENT

Defendant FHLB has moved for summary judgment, contending that it has done no more by the UCB contract than it did under the Central Bank contract; that there exists no justiciable controversy; and that it is not prohibited by law from performing its functions with respect to the money order business. Plaintiff Central Bank moves for partial summary judgment, seeking a declaration that FHLB's activities with respect to money orders is illegal and prohibited by law, and that FHLB's contract with UCB constituted an entry into the money order business. As to the justiciability issue, the court has already ruled.

It is evident from their respective agreements with FHLB that both Central Bank and UCB functioned simply as processing agents for FHLB. Any differences between them as to mode of processing are irrelevant to the larger question of whether the money order functions performed by FHLB, both directly and through its agents Central Bank and UCB, constitute the practice of banking or other unauthorized business. 12 U.S.C. § 1431(e). If so, it matters not that FHLB engaged is such business both while functioning with Central Bank as its agent and again with UCB as its agent. The activity would be equally offensive to the law in either case.

Thus, the determinative issue before the court is whether the activities of FHLB with respect to money order transactions are prohibited by law.

The facts establish that the money orders issued by FHLB bear FHLB's name as drawee and that of the seller S&L as drawer. Accordingly, each money order is an instrument drawn on the FHLB by the S&L for the benefit of the payee or such other person as may receive it by transfer. The money order evidences the fact that the payee may demand and receive upon presentation to the drawee FHLB the amount stated on the face of the instrument, but the instrument is paid from the drawer S&L's funds and any liability for payment rests solely with the S&L. *See* 2 R. Anderson, Uniform Commercial Code Commercial Paper § 3–104:20 (2d ed. 1970).

Accordingly, an FHLB money order has the effect of a check. *See Garden Check Cashing Service, Inc. v. First National City Bank*, 25 A.D.2d 137, 267 N.Y.S.2d 698, *aff'd on the opinion below*, 18 N.Y.2d 941, 277 N.Y.S.2d 141, 223 N.E.2d 566 (1966); *Lupowitz v. New York Bank for Savings*, 5 U.C.C.R.S. 851 (N.Y. Civ. Ct., 1968). Drawee FHLB is obligated to drawer S&L to honor these checks when properly presented, but the holder of the check has no right to compel the FHLB to pay him, since the money order is not a promise by drawee FHLB to pay anybody. Rather, it is an order to the FHLB by the drawer S&L to pay the sum designated to the person designated, but not a promise by the FHLB to comply. The FHLB's only liability should it not honor the money order check is to the drawee S&L for breach of the FHLB–S&L contract. F. Whitney, The Law of Modern Commercial Practices Checks § 327 (2d ed. 1965). The purchaser or payee may have recourse against the S&L, but not against the FHLB.

This arrangement of rights and liabilities at first seems somewhat at odds with the tenor of the "Money Order Sales Outlet and Trust Agreement" executed by each seller S&L. By its express terms, the S&L, though described as drawer on each money order check, is appointed as trustee for FHLB money orders and designated as a sales "outlet"; this suggests that the S&L's function with respect to the money orders is merely that of a sales agent for the FHLB.

However, the agreement also specifies that the S&L's designation as a sales outlet "is for the sole purpose of selling" money orders. Thus, while the agreement entitles the S&L to sell FHLB money orders, it does not disturb the rights and liabilities described above.[2]

■ That member S&Ls may issue checks drawn on the FHLB is clear. Section 11(g) of the original Federal Home Loan Bank Act, Pub. L. 72–304, 47 Stat. 725 (1932), provided that deposits accepted by a Federal Home Loan Bank from its members "shall not be subject to check." Two years

2. *Cf.* 12 C.F.R. § 7.7500, 5 Banking L. Rep. (CCH) ¶ 60,938 (1976), wherein the Comptroller of the Currency distinguishes between money orders "closely akin to a cashier's check on which the bank is both drawer and drawee," and money orders "closely akin to an ordinary draft." Money orders having the form of a cashier's check are signed by a "selling agent" of the issuing bank; "ordinary draft" money orders are signed by someone else. The absence of the term "agent" in the "sales outlet" agreement between FHLB and the S&Ls cannot be viewed as inadvertent.

If the FHLB money orders were, in fact, signed by S&Ls in a "selling agent" capacity, FHLB would have great difficulty in showing any relationship between its money order operations and an authorized power.

later, however, Congress amended section 11 by deleting this clause. National Housing Act, tit. 5, Pub. L. 73–479, 48 Stat. 1261 (1934). This action demonstrated that Congress no longer intended to ban this method of withdrawing funds from the FHLB by member institutions. It is an accepted canon of statutory construction that where Congress has advertently changed the legislative language, the change must be given effect. *United States v. Guthrie*, 387 F.2d 569, 571 (4th Cir. 1967); *see United States ex rel. Brion v. Prentis*, 182 F. 894, 897 (N.D.Ill.1910), *aff'd and adopted*, 192 F. 117 (7th Cir.), *cert. denied*, 223 U.S. 723, 32 S.Ct. 524, 56 L.Ed. 630 (1911).

That the S&Ls may draw by check on funds held for them by the FHLB, however, does not answer the question of whether the FHLB has authority to hold such funds for purposes of honoring money order checks, or to engage in related processing and merchandising activities.

Defendants assert that FHLB's money order activities are incidental to their statutory power to accept deposits from member S&Ls. 12 U.S.C. § 1431(e). They maintain that as the agency charged with its execution, their construction of the statute should be followed unless there are compelling reasons that it is wrong. *Moore v. Great Western Savings and Loan Association*, 513 F.2d 688, 690 (9th Cir. 1975), *citing Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

▮ In their latter point they are correct, but this duty of deference does not extend to abdication by the courts of their responsibility to construe statutes. Where the only principal dispute relates to the meaning of a statutory term, the controversy presents issues on which courts, and not administrators, are relatively more expert. *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

> The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.

*American Ship Building Co. v. NLRB*, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965); *see Zuber v. Allen*, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 130–31, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *Association of Data Processing Service Organizations, Inc. v. Federal Home Loan Bank of Cincinnati*, 421 F.Supp. 384 (S.D. Ohio, 1976).

The Federal Home Loan Bank system was intended at its inception to provide a large reservoir of credit for home financing interests. Each regional FHLB was created to be a clearinghouse between areas in which there are available surpluses of money for home loan purposes and areas where demand exceeds supply. 75 Cong. Rec. 12603–05 (1932). The FHLB was

> designed not only to assist home financing institutions in supplying the much needed credit during periods of economic emergency, but also by setting up a permanent system to make available the type of credit which is so essential, namely long-term monthly installment credit.

*Id.* at 12607.

To this end, member S&Ls may deposit funds with a FHLB which may then be advanced to other S&Ls by the FHLB. But

> [t]he funds which may be deposited by member institutions [are] to be used in the home financing field . . . .. Since these funds have been definitely earmarked for home financing purposes, their deposit with the Federal Home Loan Banks will in no way be detrimental to the commercial or agricultural interests of the country.

*Id.* at 12610.

Thus, unless the FHLB's acceptance of deposits by S&Ls of money order sales proceeds is incidental to "home financing purposes," its activity contravenes the Act. Similarly, unless its processing functions with respect to money orders serve "home financing purposes," they are prohibited.

▮ Activities are incidental to an express power where they are convenient or useful to the performance of that express power. *Arnold Tours, Inc. v. Camp*, 472

F.2d 427, 432 (1st Cir. 1972). But the court is of the opinion that it must stretch this concept too far in order to include the FHLB's money order business within its reach.

Certainly, the availability of money order services from member S&Ls may be attractive to the public, and may thus encourage deposit of funds in S&Ls by their customers, and these new deposits may thereupon be used for home financing. But, on the other hand, money deposited for money order purposes is too liquid to be either a convenient or useful source of mortgage funding; it can hardly be regarded as "definitely earmarked" for home financing purposes.

 The court is also influenced by the showing made in this case that the money order services provided by FHLB are in direct competition with those offered by Central Bank and other banks and money-order issuing institutions. It was not the intent of Congress that the FHLB should operate in competition with commercial interests. As the House committee reported at the time,

> These deposits will be entirely of surplus funds of members. The banks are specifically restrained from doing any general banking or commercial banking business. Their functions are confined solely to serving member institutions.

H. Rep. No. 1418, 72d Cong., 1st Sess. 6 (1932).

Though having a capacity to issue money orders might seem desirable to defendant FHLB and its members, it is not within the court's power to allow what Congress has disallowed, nor within the power of the FHLB to unilaterally assume that function. Congress has limited the powers of the FHLB, and it is from Congress that the FHLB must seek money order business authority.

Accordingly, the court holds that the money order business operated by defendant Federal Home Loan Bank of San Francisco is illegal under the terms of 12 U.S.C. § 1431(e). Defendants' motion for summary judgment is denied; plaintiff's motion for partial summary judgment is granted to the extent specified below.

## RELIEF

 The court finds and declares that the Federal Home Loan Banks, including the Federal Home Loan Bank of San Francisco, are prohibited by the Federal Home Loan Bank Act, 12 U.S.C. § 1421 *et seq.*, from engaging in the money order business, including, but not limited to, the functions of issuance of money order forms and other equipment, authorization of money order sales, acceptance of deposits of money order sales proceeds for purposes of acting as drawee for money order checks, processing of money order collection and payment (either directly or through an agent), and other related activities.

The court further finds and declares that the contract between United California Bank and the Federal Home Loan Bank of San Francisco did not constitute entry into the money order business, but that its entry occurred when the Federal Home Loan Bank of San Francisco first offered its money order services to member savings and loan associations in 1972.

Although plaintiff has moved only for partial summary judgment, any remaining issues before the court are essentially resolved by the court's declaration that the money order business of the Federal Home Loan Banks is illegal. None of the affirmative defenses asserted by defendants can survive that declaration.[3] Irreparable inju-

---

**3.** Defendants assert (1) that the court lacks subject matter jurisdiction; (2) that plaintiff fails to state a claim on which relief can be granted; (3) that any relief granted will not protect a substantial, direct or legally protectable interest of plaintiff; (4) that plaintiff lacks standing; (5) that plaintiff is barred and estopped by its own conduct from any recovery or relief; (6) that plaintiff's claims are barred by the statute of limitations and by laches; and (7) that the doctrine of "unclean hands" precludes relief. Plaintiff's good-faith participation in the processing of defendants' money orders does not constitute conduct which would preclude relief.

ry to plaintiff being shown by defendants' continuing engagement in illegal competition with it, and no adequate remedy being available at law, there is no reason why an injunction should not now issue.

It is, therefore, the order of the court that defendants Federal Home Loan Bank of San Francisco; Garth Marsden, Acting Chairman, Federal Home Loan Bank Board; Grady Perry, Member, Federal Home Loan Bank Board; and their officers, agents, servants and employees, and persons who are in active concert or participation with them or who receive actual notice of this order, shall not authorize, approve, or condone any activity of a Federal Home Loan Bank having to do with money order transactions where the drawee is a Federal Home Loan Bank. Such prohibited activities include, but are not limited to, the functions of issuance of money order forms and other equipment, authorization of money order sales, acceptance of deposits of money order sales proceeds for purposes of acting as drawee for money order checks, and processing of money order collection and payment requests, either directly or through an agent.

The court issues this order for the reason that these activities are prohibited by 12 U.S.C. § 1431(e). Fed. R. Civ. P. 65(d).