729 F.2d 811
 234 U.S.App.D.C. 325
 WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
Western Union International, Inc., RCA Global
Communications, Inc., TRT Telecommunications
Corporation, Consortium Communications
International, Inc.,
International Relay,
Inc., Intervenors.
TRT TELECOMMUNICATIONS CORPORATION, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
Consortium Communications International, Inc., International
Relay, Inc., Western Union Telegraph Company, Western Union
International, Inc., RCA Global Communications, Inc., FTC
Communications, Inc., Graphnet, Inc., Mobile Marine Radio,
Inc., Intervenors.
ITT WORLD COMMUNICATIONS INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
International Relay, Inc., Consortium Communications
International, Inc., Western Union Telegraph Company, RCA
Global Communications, Inc., FTC Communications, Inc.,
Graphnet, Inc., Mobile Marine Radio, Inc., TRT
Telecommunications Corporation, Western Union International,
Inc., Intervenors.
WESTERN UNION INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
International Relay, Inc., Consortium Communications
International, Inc., Western Union Telegraph Company, RCA
Global Communications, Inc., FTC Communications, Inc.,
Graphnet, Inc., Mobile Marine Radio, Inc., TRT
Telecommunications Corporation, Intervenors.
WESTERN UNION INTERNATIONAL, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
Consortium Communications International, Inc., Western Union
Telegraph Company, International Relay, Inc., Mobile Marine
Radio, Inc., FTC Communications, Inc., Graphnet, Inc., TRT
Telecommunications Corporation, RCA Global Communications,
Inc., Intervenors.
ITT WORLD COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
Consortium Communications International, Inc., Western Union
Telegraph Company, International Relay, Inc., Graphnet,
Inc., RCA Global Communications, Inc., TRT
Telecommunications Corporation, FTC Communications, Inc.,
Intervenors.
RCA GLOBAL COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
Western Union Telegraph Company, Consortium Communications
International, Inc., International Relay, Inc., Graphnet,
Inc., TRT Telecommunications Corporation, Western Union
International, Inc., FTC Communications, Inc., Intervenors.
GRAPHNET, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
International Relay, Inc., Western Union Telegraph Company,
TRT Telecommunications Corporation, Consortium
Communications International, Inc., ITT World
Communications, Inc., Mobile Marine Radio, Inc., RCA Global
Communications, Inc., Intervenors.
ITT WORLD COMMUNICATIONS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and The United States of
America, Respondents,
International Relay, Inc., Western Union Telegraph Company,
TRT Telecommunications Corporation, Consortium
Communications International, Inc., RCA
Global Communications, Inc.,
Intervenors.
 Nos. 82-1502, 82-1658, 82-1698 to 82-1700, 82-1746, 82-1759,
83-1461 and 83-1526.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 17, 1984.
Decided March 7, 1984.
As Amended March 15, 1984.
 
 Petitions for Review of an Order of the Federal Communications commission
 E. Edward Bruce, Thomas William Mayo and Lloyd D. Young, Washington, D.C., were on the statement in lieu of brief for TRT Telecommunications Corporation, petitioner in No. 82-1658 and intervenor in Nos. 82-1502, 82-1698, 82-1699, 82-1700, 82-1746, 82-1759, 83-1461 and 83-1526.
 Robert E. Conn, Washington, D.C., entered an appearance for Western Union International, Inc., petitioner in Nos. 82-1699 and 82-1700 and intervenor in Nos. 82-1502, 82-1658, 82-1698 and 82-1759.
 Jane E. Mago, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Nancy E. Stanley, Counsel, F.C.C., John J. Powers, III and William J. Roberts, Attorneys, Dept. of Justice, Washington, D.C., were on the brief for respondents in all cases. Linda L. Oliver, Stephen A. Sharp, Lisa B. Margolis, Counsel, F.C.C., and Barry Grossman, Attorney, Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 Alan Y. Naftalin, Washington, D.C., with whom Margot Smiley Humphrey, Washington, D.C., Francis J. DeRosa and Charles M. Lehrhaupt, New York City, were on the brief for RCA Global Communications, intervenor in Nos. 82-1502, 82-1658, 82-1698, 82-1699, 82-1700, 82-1746, 83-1461 and 83-1526, and petitioner in No. 82-1759.
 
 
 2
 Ian D. Volner and David M. Rickless, Washington, D.C., were on the brief for Consortium Communications International, Inc., intervenor in Nos. 82-1502, 82-1658, 82-1698, 82-1699, 82-1700, 82-1746, 82-1759, 83-1461 and 83-1526.
 
 
 3
 Steven A. Levy, Washington, D.C., was on the brief for International Relay, Inc., intervenor in Nos. 82-1502, 82-1658, 82-1698, 82-1699, 82-1700, 82-1746, 82-1759, 83-1461 and 83-1526.
 
 
 4
 Roger P. Newell, New York City, entered an appearance for FTC Communications, Inc., intervenor in Nos. 82-1502, 82-1658, 82-1698, 82-1699, 82-1700, 82-1746 and 82-1759.
 
 
 5
 Martin W. Bercovici, Washington, D.C., entered an appearance for Mobile Marine Radio, Inc., intervenor in Nos. 82-1658, 82-1698, 82-1699, 82-1700 and 83-1461.
 
 
 6
 William R. Weissman, Washington, D.C., with whom Joel Yohalem and H. Richard Juhnke, Washington, D.C., were on the brief for petitioner, Western Union Telegraph Company, in No. 82-1502 and intervenor in Nos. 82-1658, 82-1698, 82-1699, 82-1700, 82-1746, 82-1759, 83-1461 and 83-1526. William Warfield Ross and Arthur H. Simms, Washington, D.C., also entered appearances for Western Union Telegraph Company.
 
 
 7
 Thomas J. Casey, Washington, D.C., with whom Bruce D. Sokler and Stanford B. Weinstein, Washington, D.C., were on the brief for Graphnet, Inc., petitioner in No. 83-1461 and intervenor in Nos. 82-1658, 82-1698, 82-1699, 82-1700, 82-1746 and 82-1759.
 
 
 8
 John S. Kinzey, Jr., New York City, with whom Grant S. Lewis, Joseph J. Jacobs and John Ligon, New York City, were on the brief for ITT World Communications, Inc., petitioner in Nos. 82-1698, 82-1746 and 83-1526, and intervenor in No. 83-1461. Samuel J. Abate, Jr., New York City, and Eugene R. Fidell, Washington, D.C., also entered appearances for ITT World Communications, Inc.
 
 
 9
 Before TAMM, EDWARDS and GINSBURG, Circuit Judges.
 
 
 10
 Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.
 
 HARRY T. EDWARDS, Circuit Judge:
 
 11
 This case involves the first major challenge to the Federal Communications Commission's ("FCC's") implementation of the Record Carrier Competition Act of 1981 ("the Act"). 47 U.S.C. Sec. 222 (Supp. V 1981). Prior to passage of the Act, the record carrier communications market[1] was substantially bifurcated; the Western Union Telegraph Company dominated the domestic market, but was prohibited from engaging in international services. See 47 U.S.C. Sec. 222(c)(2) (1976), amended by 47 U.S.C. Sec. 222 (Supp. V 1981); Western Union Telegraph Co. v. FCC, 665 F.2d 1126, 1131 n. 7 (D.C.Cir.1981). The Act was designed to remove this dichotomy "and permit full and vigorous competition in both the international and domestic record communications markets without the constraints imposed by an artificial division of the market." H.R.REP. NO. 356, 97th Cong., 1st Sess. 4 (1981), U.S.Code Cong. & Admin.News 1981, 2730.
 
 
 12
 The Act authorizes record carriers, including Western Union, to provide record service in both the domestic and international markets. 47 U.S.C. Sec. 222(c)(5), (d) (Supp. V 1981). It also stipulates that carriers must make their facilities available for interconnection on reasonable terms. Id. Sec. 222(c)(1)(A)(i). Because the carriers have been unable to reach an agreement on these terms within the time limits provided by the Act, the FCC has, pursuant to the Act's command, issued an order establishing the necessary arrangements. Interconnection Arrangements Between and Among the Domestic and International Record Carriers, 89 F.C.C.2d 928 (1982) (hereinafter "Interim Order"), reprinted in Joint Appendix ("J.A.") 338. See 47 U.S.C. Sec. 222(c)(3)(B) (Supp. V 1981). Four aspects of this order are at issue in this case.
 
 
 13
 At the outset, we must emphasize that this case is being heard on a highly expedited basis. As the FCC acknowledges, under the Act the terms established in the Commission's order "remain in effect only for three years following the date the statute was enacted--i.e., only until December 29, 1984." Respondents' brief, pp. 10-11. See 47 U.S.C. Sec. 222(e)(1) (Supp. V 1981). Hence, while we have considered the parties' arguments with great care, we will be concise in our description and resolution of this case in order to hasten the Commission's reconsideration of its decision.[2]
 
 I.
 
 14
 The first issue that we consider is which carriers should be in charge of tariffing, billing and collecting for interconnected international calls that are outbound from the United States. The Commission's order specifies that for such calls "the U.S. international carrier will bill the customer for the entire through rate and compensate the domestic carrier." Interim Order, 89 F.C.C.2d at 957, reprinted in J.A. 367. We hold, however, that the decision to have this function performed by an international record carrier ("IRC"), which is "handed off" a call that a domestic carrier has initiated, cannot be reconciled with the Act's language.
 
 
 15
 The Act specifies that a carrier "shall have the right to establish the total price charged by such party to the public for any such service which is originated by such party." 47 U.S.C. Sec. 222(c)(2) (Supp. V 1981). This language clearly dictates that the carrier originating a service is responsible for setting the total price for the service and charging the public. Indeed, in the case of wholly domestic calls the Commission has recognized that the originating carrier is "the carrier on whose network the call [is] initiated" and has provided that this carrier will set the tariffed rate, bill and collect from the customer, and then compensate the terminating carrier. Interim Order, 89 F.C.C.2d at 957, reprinted in J.A. 367. We can discern no satisfactory rationale for deviating from this approach when a domestic carrier initiates an outbound international call. The statutory language certainly does not admit such a distinction, and this is strongly reenforced by the relevant legislative history: "This paragraph insures that the terminating carrier will recoup its costs through the allocation of revenues and permits the originating carrier to recover its costs by setting a rate to the public that is sufficient to recover its own costs plus its payment of the terminating carrier's revenue share." H.R.REP. NO. 356, supra, at 11, U.S.Code Cong. & Admin.News 1981, at 2737.
 
 
 16
 In light of both the language and history of the statute, we hold that the Commission must designate the domestic carrier that initiates an outbound call as the originating carrier, which is responsible for tariffing, collecting and billing.
 
 II.
 
 17
 Petitioner Graphnet, Inc., argues that the Commission also erred in prescribing "a 15% discount from a carrier's publicly tariffed intra-network rate which will apply to all carriers when performing interconnected 'terminating' functions." Interim Order, 89 F.C.C.2d at 960, reprinted in J.A. 370 (footnote omitted). Graphnet relies on an Administrative Law Judge's determination in a related rate proceeding that "an IRC-Western Union interconnection costs at least 20-23 percent less than customer-to-customer service." Petitioner Graphnet, Inc.'s brief, p. 31. See Western Union Telegraph Co., C.C. Docket No. 78-97 (Released Mar. 10, 1982) (Initial Decision in Phase I), reprinted in J.A. 109. Graphnet argues that it was arbitrary and capricious to deviate from this figure, noting that "[t]he record carriers (other than Western Union) vigorously pressed the usefulness of [the ALJ's] impartial decision." Petitioner Graphnet, Inc.'s brief, p. 31. The Commission defended its choice of a 15% discount, arguing that it had not yet completed the related proceeding in C.C. Docket 78-97. See Interim Order, 89 F.C.C.2d at 959-60, reprinted in J.A. 369-70. It emphasized that the 15% discount was only an interim decision, which would be modified if its findings in C.C. Docket 78-97 indicated that this was warranted. In its brief, the Commission also stressed that when it reached a final decision, it would be "in a position to order adjustment of the interim discount and any necessary and appropriate refunds based on the final prescription." Respondents' brief, p. 61. Indeed, in its interim order, the Commission required that "complete traffic and financial records be maintained so that a full accounting may occur upon the final resolution of Phase II [of C.C. Docket No. 78-97]." Interim Order, 89 F.C.C.2d at 960 n. 33, reprinted in J.A. 370.
 
 
 18
 Subsequent to the filing of briefs in this case, the related investigation in phase one of C.C. Docket 78-97 was completed. See Western Union Telegraph Co., C.C. Docket No. 78-97 (Released Oct. 28, 1983) (Final Decision in Phase I). In its final decision in that proceeding, the Commission rejected the findings of the ALJ and "concluded that there were no significant cost savings associated with Western Union's handling of IRC-interconnected Telex/TWX traffic as opposed to public domestic Telex/TWX traffic." Id. at 41. The Commission is now in the process of reevaluating the 15% discount rate prescribed in the interim order, pursuant to Western Union's request that the discount be reduced. See Respondents' Supplemental Brief, p. 3 n. 2; Western Union Telegraph Co., C.C. Docket No. 78-97, at 41 (Final Decision in Phase I) ("The conclusions we have reached today in Phase I will undoubtedly have an impact on Phase II of this proceeding and the interim discount prescribed in Docket No. 82-122. We shall shortly issue separate orders regarding those matters."). Until the Commission has concluded this inquiry, review of Graphnet's request that the interim discount be increased would waste judicial resources and would unduly interfere with the Commission's proceedings. See Western Union International, Inc. v. FCC, 652 F.2d 136, 143-45 (D.C.Cir.1980). In so holding, we adhere to prevailing law in this circuit indicating that temporary rates, subject to refund when a final rate is prescribed, are not reviewable. Seaboard & Western Airlines, Inc. v. CAB, 181 F.2d 515, 520 (D.C.Cir.1949).
 
 III.
 
 19
 We next consider petitioner ITT World Communications, Inc.'s challenge to the Commission's formula for allocating revenues received for outbound calls when two interconnecting IRCs are involved. This formula was adopted pursuant to a broad statutory mandate to the Commission to establish a formula for the equitable allocation of revenues that, to the extent possible, was to be cost-based. 47 U.S.C. Sec. 222(c)(2) (Supp. V 1981). ITT World Communications does not seriously dispute the FCC's claim that it was not possible to prescribe a cost-based formula within the Act's time limits. Nor does it deny that Congress' "overriding" concern was that a formula be prescribed "within the timeframe established by the bill." H.R.REP. NO. 356, supra, at 11, U.S.Code Cong. & Admin.News 1981, at 2737. Given the haste with which the Commission was required by Congress to act, and the limited information available to it, the Commission's decision is entitled to considerable deference.
 
 
 20
 We are convinced that the Commission's decision is consistent with the statute as well as with the requirements of the Administrative Procedure Act, 5 U.S.C. Secs. 551-559, 701-706 (1982). Congress was concerned with the dominant position enjoyed by "transiting" IRCs with foreign operating agreements (which authorize these IRCs to operate in foreign countries), and it was certainly permissible for the Commission to reject the formula used in existing tariffs on the ground that it reflected the superior bargaining power of these IRCs. See Interim Order, 89 F.C.C.2d at 961-62, reprinted in J.A. 371-72. In view of its broad statutory mandate and Congress' command that the Commission act promptly, we cannot say that the FCC acted unlawfully or unreasonably in prescribing that revenues be split between the "originating" IRC and the transiting IRC after the foreign payment is accounted for. Further, establishing a floor to ensure that the "originating" IRC can cover the domestic charge is not inequitable because the transiting IRCs will still receive as much revenue on these calls as they would if they handled the entire international transmission alone.
 
 IV.
 
 21
 On the final issue before us, we reverse the Commission's requirement that revenues received for inbound calls be distributed pro rata between interconnecting IRCs. The statutory authority on which the Commission relied only empowered it to order a pro rata distribution of inbound services, not revenues. As this language and the legislative history plainly indicate, the pro rata requirement was intended to govern the physical "distribution of traffic." H.R.REP. NO. 356, supra, at 11, U.S.Code Cong. & Admin.News 1981, at 2737. When it proved technically infeasible to redistribute traffic in the manner dictated by Congress, the FCC had no authority to require instead a pro rata distribution of revenues received for inbound services, especially to carriers who played no demonstrable part in providing these services. It is not at all clear that Congress would have approved such a scheme, and there is no plausible way that the statute can be read to have authorized the FCC's action.
 
 
 22
 Moreover, even assuming arguendo that the Commission could order a pro rata distribution of revenues, it was not authorized to do so in the broad manner it has chosen. In providing for a pro rata distribution of services, Congress was responding to the fact that
 
 
 23
 many countries assign U.S. bound traffic among U.S. carriers according to the amount of traffic each U.S. carrier brings into that particular country. To the extent that such an arrangement benefits the carrier with an interconnection agreement (because of an increase in traffic resulting from the use of its facilities by the interconnecting carrier lacking such an agreement) the Committee believes that this benefit should accrue to ... the carrier generating the outbound traffic.
 
 
 24
 Id. at 10-11, U.S.Code Cong. & Admin.News 1981, at 2736-2737. The pro rata distribution was intended to be tailored to this particular concern: "In order to correct this deficiency in a free market, the Committee has included a requirement that where countries assign U.S. bound traffic in this manner, a proportionate share [will] be allocated by the U.S. carrier with the foreign agreement to the carrier responsible for the increased allocation." Id. at 11, U.S.Code Cong. & Admin.News 1981, at 2737. (emphasis added). Despite this unequivocal legislative intent, under the FCC's plan the distribution of revenues bears no discernible relationship to whether a carrier generates traffic outbound from a foreign country; i.e., even when a foreign country's outbound traffic is not based on the traffic that a carrier brings into the country, the FCC has ordered a pro rata distribution of revenues.
 
 
 25
 To avoid this type of windfall, Congress expressly limited the scope of the pro rata distribution requirement. Traffic is exempted from this requirement "in any case in which the customer ... has the option to specify the international record carrier which will provide such ... service." 47 U.S.C. Sec. 222(c)(1)(A)(ii)(II) (Supp. V 1981). In such a case, carriers bringing traffic into a country cannot be said to generate outbound traffic, since the choice of the outbound carrier is not based on inbound traffic. The FCC essentially has disregarded this statutory proviso by exempting traffic only if the country involved permits customers to choose any carrier. Such a restrictive view of the statutory language is unwarranted. As the FCC concedes, no country permits a choice of any carrier, and hence the FCC's interpretation vitiates the exemption mandated by Congress. Such a result surely should be avoided when the statute can just as easily be read to exempt traffic in any case in which the customer is permitted to choose among some carriers.
 
 
 26
 In reversing the pro rata scheme implemented by the FCC, we are cognizant of the Commission's concern that foreign operating agreements impede competition. However, Congress also was aware of this problem and statutorily prescribed a specific scheme to rectify it. If this scheme proves unworkable, the FCC must return to Congress and seek appropriate legislation. The Commission cannot simply ignore Congress' words and attempt to write a new statute out of whole cloth. In reaching this conclusion, we pay heed to a concern repeatedly voiced by the Supreme Court: "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). See also Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339-340, 38 L.Ed.2d 287 (1973) ("Courts need not defer to an administrative construction of a statute where there are 'compelling indications that it is wrong.' ") (quoting Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (footnote omitted)); Zuber v. Allen, 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345 (1969) (holding that statutory language did not grant Secretary of Agriculture authority to order price differential at issue, and indicating that courts may not abdicate their "ultimate responsibility to construe the language employed by Congress").
 
 CONCLUSION
 
 27
 Those parts of the FCC's order designating IRCs as the originating carriers on calls outbound from the United States, and requiring pro rata distribution of revenues received for inbound calls, are reversed and remanded for further proceedings consistent with this opinion. The Commission's formula for allocating revenues from outbound calls is a reasonable implementation of the statutory language and is upheld. However, we will also remand this aspect of the agency's decision because the Commission may choose to modify this formula in light of our reversal of the pro rata distribution of revenues from inbound calls.
 
 
 28
 So ordered.
 
 
 
 [1]
 Record communications services include "those services traditionally offered by telegraph companies, such as telegraph, telegram, telegram exchange, and similar services involving an interconnected network of teletypewriters." 47 U.S.C. Sec. 222(a)(3) (Supp. V 1981)
 
 
 [2]
 A thorough description of the relevant facts and the FCC's decision can be found in the FCC's interim order and in the Notice of Proposed Rulemaking, 89 F.C.C.2d 194 (1982), reprinted in J.A. 89